*Decision will be entered under Rule 50.*

PENN MUTUAL INDEMNITY COMPANY (DISSOLVED), FRANCIS R. SMITH, INSURANCE COMMISSIONER OF THE COMMONWEALTH OF PENNSYLVANIA, STATUTORY LIQUIDATOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 55553. Filed June 15, 1959.

*John T. Curtin, Esq.*, for the petitioner.
*Morton A. Smith, Esq.*, for the respondent.

### OPINION.

RAUM, *Judge:* Respondent determined a deficiency in the 1952 income tax liability of the Penn Mutual Indemnity Company in the amount of $12,566.76. The sole issue is whether section 207(a)(2) of the Internal Revenue Code of 1939 is constitutional as here applied. The facts have been stipulated.

Francis R. Smith, the Insurance Commissioner of the Commonwealth of Pennsylvania, is the statutory receiver of Penn Mutual Indemnity Company and as such, successor in right, title, and interest to its assets and liabilities.

The company was incorporated in 1929 under the laws of Pennsylvania and became subject to the Insurance Company Law of that State (Act of May 17, 1921, P.L. 682.) The company was authorized under its charter, as amended, to transact business in Pennsylvania, "covering risks as insurance carrier, generally defined as casualty risks including public liability, plate glass insurance, burglary, workman's compensation, as well as issuing contracts of fidelity and surety, and fire and comprehensive insurance contracts."

The company, at all times relevant, was authorized to transact business and issue contracts of insurance covering various risks within Pennsylvania only, and at all times confined its activities as an insurance carrier within the territorial limits of Pennsylvania. At no

time was it authorized or licensed by the United States or any Federal body or agency to transact business or issue or write contracts of insurance.

As a result of operations for the calendar year 1952, the company had a total "gross income" of $16,791.21 and "net premiums" of $1,239,884.49 for a "gross amount of income" of $1,256,675.70.[1] It also had underwriting losses which exceeded its gross amount of income by $206,198.12, which losses are not recognized as a deduction under section 207(a)(2) of the Internal Revenue Code of 1939. The company filed its income tax return for the year 1952 with the district director of internal revenue at Philadelphia, Pennsylvania. The return disclosed a total tax due in the amount of $12,566.76, but by letter attached thereto, the company denied that this sum was owing on the ground that section 207(a)(2) of the Internal Revenue Code of 1939 was unconstitutional. Respondent thereafter determined a deficiency in the amount of $12,566.76.[2]

The parties have agreed that the company "was a mutual insurance company under Section 207 of the Internal Revenue Code of 1939 and if the said Section 207 is constitutional, the deficiency is $12,566.76."

Section 207 of the Internal Revenue Code of 1939, as amended,[3] established a system for the taxation of mutual insurance companies other than life or marine. Provisions for the taxation of stock insurance companies and mutual life or marine insurance companies are found in other, although closely neighboring, sections of the 1939 Code.

The business of insurance has proven over the years an extremely difficult subject for Federal taxation. The determination of what should constitute "income" in the case of insurance companies, combined with differences in the methods of doing business of mutual and stock companies, has presented the Congress with problems of unusual complexity.

Prior to 1942 most mutual insurance companies other than life were exempt from Federal income tax as a result of an exemption contained in section 101(11) of the 1939 Code. In 1942, Congress proceeded to an extensive revision of the income tax treatment of all insurance companies.

---

[1] This sentence is substantially as stipulated by the parties, and possible confusion that may arise therefrom is attributable to the sense in which the terms quoted above are used. The term "gross income" is used apparently to mean gross income from investments. On the other hand, the term "gross amount of income" appears to refer to the special statutory base, specified in section 207(a)(2), I.R.C. 1939 (see footnote 4, *infra*), which includes net premiums as well as investment income.

[2] The Government filed a motion to dismiss the present proceeding for lack of jurisdiction, which was denied. Such denial was in accord with well-established practice in this tribunal. *Continental Accounting & Audit Co.,* 2 B.T.A. 761, 763–764; *John Moir,* 3 B.T.A. 21, 22; *United States Fidelity & Guaranty Co.,* 5 B.T.A. 23, 26; *Powell Coal Co.,* 12 B.T.A. 492, 497; *Edward J. Lehmann,* 21 B.T.A. 664, 671; *Fred Taylor,* 36 B.T.A. 427, 429.

[3] Reenacted in substantially identical form as sections 821–823 of the Internal Revenue Code of 1954.

The Revenue Act of 1942, as passed by the House, limited the existing exemption of mutual insurance companies to companies of a designated size; at the same time, it imposed a tax measured by underwriting and investment income similar to that which had been applicable to stock insurance companies other than life since 1921. See H. Rept. No. 2333, 77th Cong., 2d Sess., pp. 27–28, 113–118. However, the Senate Finance Committee apparently felt that the provisions formulated to adapt that scheme of taxation to mutual companies were unworkable, and it appeared unable to develop any satisfactory technique to achieve the desired end within the framework of the House plan of taxation. See S. Rept. No. 1631, 77th Cong., 2d Sess., p. 31. Accordingly, the committee proposed an entirely different scheme of taxation, S. Rept. No. 1631, *supra*, pp. 31, 150–154, which the Senate approved. That plan was ultimately accepted by the conference committee, although modified in certain particulars not presently material. H. Rept. 2586, 77th Cong., 2d Sess., pp. 10–12. As thus modified, it was enacted into law in the provisions here for review.

The new taxing provisions thus appearing in the Revenue Act of 1942 constituted a complete revision of section 207 of the 1939 Code. Section 207, incorporating amendments made subsequent to the Revenue Act of 1942 which are applicable to 1952, the taxable year here involved, is set forth in the margin.[4] These latter amendments were

---

[4] SEC. 207. MUTUAL INSURANCE COMPANIES OTHER THAN LIFE OR MARINE.

(a) IMPOSITION OF TAX.—There shall be levied, collected, and paid for each taxable year upon the income of every mutual insurance company (other than a life or a marine insurance company or a fire insurance company subject to the tax imposed by section 204 and other than an interinsurer or reciprocal underwriter) a tax computed under paragraph (1) or paragraph (2) whichever is the greater and upon the income of every mutual insurance company (other than a life or a marine insurance company or a fire insurance company subject to the tax imposed by section 204) which is an interinsurer or reciprocal underwriter, a tax computed under paragraph (3) :

(1) If the corporation surtax net income is over $3,000 a tax computed as follows :

(A). [No provision.]

(B) Taxable Years Beginning After March 31, 1951, and Before April 1, 1954.—
In the case of taxable years beginning after March 31, 1951, and before April 1, 1954—

(i) Normal tax.—A normal tax of 30 per centum of the normal-tax net income, or 60 per centum of the amount by which the normal-tax net income exceeds $3,000, whichever is the lesser ; plus

(ii) Surtax.—A surtax of 22 per centum of the corporation surtax net income in excess of $25,000.

(2) If for the taxable year the gross amount of income from interest, dividends, rents, and net premiums, minus dividends to policyholders, minus the interest which under section 22(b)(4) is excluded from gross income, exceeds $75,000, a tax equal to the excess of—

(A) 1 per centum of the amounts so computed, or 2 per centum of the excess of the amount so computed over $75,000, whichever is the lesser, over

(B) the amount of the tax imposed under Subchapter E of Chapter 2.
*     *     *     *     *     *     *

(4) GROSS AMOUNT RECEIVED OVER $75,000, BUT LESS THAN $125,000.—If the gross amount received during the taxable year from interest, dividends, rents, and premiums (including deposits and assessments) is over $75,000 but less than $125,000, the amount ascertained under paragraph (1), paragraph (2)(A) and paragraph (3) shall be an

required primarily by changes in corporation income tax rates during the years subsequent to 1942 and did not alter the basic structure of the tax first imposed in 1942.

amount which bears the same proportion to the amount ascertained under such paragraph, computed without reference to this paragraph, as the excess over $75,000 of such gross amount received bears to $50,000.

\* \* \* \* \* \* \* \*

(b) DEFINITION OF INCOME, ETC.—In the case of an insurance company subject to the tax imposed by this section—

(1) GROSS INVESTMENT INCOME.—"Gross investment income" means the gross amount of income during the taxable year from interest, dividends, rents, and gains from sales or exchanges of capital assets to the extent provided in section 117;

(2) NET PREMIUMS.—"Net premiums" means gross premiums (including deposits and assessments) written or received on insurance contracts during the taxable year less return premiums and premiums paid or incurred for reinsurance. Amounts returned where the amount is not fixed in the insurance contract but depends upon the experience of the company or the discretion of the management shall not be included in return premiums but shall be treated as dividends to policyholders under paragraph (3);

(3) DIVIDENDS TO POLICYHOLDERS.—"Dividends to policyholders" means dividends and similar distributions paid or declared to policyholders. The term "paid or declared" shall be construed according to the method regularly employed in keeping the books of the insurance company;

(4) NET INCOME.—The term "net income" means the gross investment income less—

(A) Tax-free Interest.—The amount of interest which under section 22(b)(4) is excluded for the taxable year from gross income;

(B) Investment Expenses.—Investment expenses paid or accrued during the taxable year. If any general expenses are in part assigned to or included in the investment expenses, the total deduction under this subparagraph shall not exceed one-fourth of 1 per centum of the mean of the book value of the invested assets held at the beginning and end of the taxable year plus one-fourth of the amount by which net income computed without any deduction for investment expenses allowed by this subparagraph, or for tax-free interest allowed by subsection (b)(4)(A), exceeds 3¾ per centum of the book value of the mean of the invested assets held at the beginning and end of the taxable year;

(C) Real Estate Expenses.—Taxes and other expenses paid or accrued during the taxable year exclusively upon or with respect to the real estate owned by the company, not including taxes assessed against local benefits of a kind tending to increase the value of the property assessed, and not including any amount paid out for new buildings, or for permanent improvements or betterments made to increase the value of any property. The deduction allowed by this paragraph shall be allowed in the case of taxes imposed upon a shareholder of a company upon his interest as shareholder, which are paid or accrued by the company without reimbursement from the shareholder, but in such cases no deduction shall be allowed the shareholder for the amount of such taxes;

(D) Depreciation.—A reasonable allowance, as provided in section 23(l), for the exhaustion, wear and tear of property, including a reasonable allowance for obsolescence;

(E) Interest Paid or Accrued.—All interest paid or accrued within the taxable year on indebtedness, except on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from taxation under this chapter.

(F) Capital Losses.—Capital losses to the extent provided in section 117 plus losses from capital assets sold or exchanged in order to obtain funds to meet abnormal insurance losses and to provide for the payment of dividends and similar distributions to policyholders. Capital assets shall be considered as sold or exchanged in order to obtain funds to meet abnormal insurance losses and to provide for the payment of dividends and similar distributions to policyholders to the extent that the gross receipts from their sale or exchange are not greater than the excess, if any, for the taxable year of the sum of dividends and similar distributions paid to policyholders, losses paid, and expenses paid over the sum of interest, dividends, rents, and net premiums received. In the application of section 117(e) for the purposes of this section, the net capital loss for the taxable year shall be the amount by which

The basic pattern of the new system adopted in 1942 was described by the Senate Finance Committee as follows (S. Rept. No. 1631, *supra* at 151) :

In the case of mutual insurance companies other than life or marine which are not granted exemption under section 101(11),[5] it is proposed to subject such companies to *income tax at the regular corporate rates* on their net investment income *or to a special tax of 1 percent* on the gross amount received from interest, dividends, rents, and net premiums, minus dividends to policyholders, minus the interest which under section 22(b) (4) is excluded from gross income, whichever is the greater * * * [Italics supplied.]

Section 207(a) levies a tax on every mutual insurance company (other than life or marine or a fire insurance company subject to tax under section 204) upon either one of two bases, whichever produces the greater amount of tax. The first base, embodied in section 207(a)(1), is net investment income to which is applied the rates applicable to corporation incomes generally. The second base, embodied in section 207(a)(2), is the "gross amount of income" from interest, dividends, rents, and net premiums, less dividends to policyholders and less wholly tax-exempt interest. If the base so computed exceeds $75,000, the tax is an amount equal to the excess of—

losses for such year from sales or exchanges of capital assets exceeds the sum of the gains from such sales or exchanges and whichever of the following amounts is the lesser :

(i) the corporation surtax net income (computed without regard to gains or losses from sales or exchanges of capital assets) ; or

(ii) losses from the sale or exchange of capital assets sold or exchanged to obtain funds to meet abnormal insurance losses and to provide for the payment of dividends and similar distributions to policyholders.

(c) RENTAL VALUE OF REAL ESTATE.—The deduction under subsection (b)(4)(C) or (b)(4)(D) of this section on account of any real estate owned and occupied in whole or in part by a mutual insurance company subject to the tax imposed by this section, shall be limited to an amount which bears the same ratio to such deduction (computed without regard to this subsection) as the rental value of the space not so occupied bears to the rental value of the entire property.

(d) AMORTIZATION OF PREMIUM AND ACCRUAL OF DISCOUNT.—The gross amount of income during the taxable year from interest, the deduction provided in subsection (b)(4)(A), and the credit allowed against net income in section 26(a) shall each be decreased by the appropriate amortization of premium and increased by the appropriate accrual of discount attributable to the taxable year on bonds, notes, debentures or other evidences of indebtedness held by a mutual insurance company subject to the tax imposed by this section. Such amortization and accrual shall be determined (1) in accordance with the method regularly employed by such company, if such method is reasonable, and (2) in all other cases, in accordance with regulations prescribed by the Commissioner with the approval of the Secretary.

*       *       *       *       *       *       *

(f) DOUBLE DEDUCTIONS.—Nothing in this section shall be construed to permit the same item to be twice deducted.

(g) CREDITS UNDER SECTION 26.—For the purposes of this section, in computing normal tax net income and corporation surtax net income, the credits provided in section 26 shall be allowed in the manner and to the extent provided in sections 13(a) and 15(a).

[5] Section 101(11), which had previously exempted most mutual insurance companies other than life, was rewritten so as to limit the exemption to small companies; but in seeking to attain that objective the Senate used a different formula from the one approved by the House.

(A) 1 per centum of the amounts so computed, or 2 per centum of the excess of the amount so computed over $75,000, whichever is the lesser, over

(B) the amount of the tax imposed under Subchapter E of Chapter 2.

The reference in subparagraph (B) to "Subchapter E of Chapter 2" is a reference to the excess profits tax, and since no such tax was applicable here, subparagraph (B) played no part in the present computation, which consisted merely of 1 per cent of the "gross amount of income."

In this case the computation under section 207(a)(2) produced a greater liability than the one determined under section 207(a)(1); accordingly, the amount of tax levied by section 207 was fixed by subsection (a)(2). There is no disagreement between the parties that if section 207(a)(2) is constitutional, the computation of the company's 1952 tax liability is governed thereby, and the deficiency determined by the Commissioner is correct. No issue of statutory construction or application of the statute is here presented.

At the outset we may briefly dispose of the contention raised in the petition that the tax is "in effect, a license fee or charge to do business to which the United States is not entitled since it has not issued any license or grant to the taxpayer to operate or do business." The argument is wholly without substance. The United States has not sought to regulate the company, and the tax in question is part of a comprehensive revenue measure. Whether the business of the taxpayer can be subjected to Federal regulation has no bearing upon the validity of an exercise of taxing power with respect to that taxpayer. *Steward Machine Co.* v. *Davis*, 301 U.S. 548, 582; *Flint* v. *Stone Tracy Co.*, 220 U.S. 107, 152–158. We pass therefore to a consideration of whether the challenged exaction is otherwise authorized under the taxing power.

An act of Congress is not lightly to be set aside, and doubt must be resolved in its favor. So much is familiar learning. Moreover, the presumption in favor of validity is particularly strong in the case of a revenue measure. As was stated many years ago by the Supreme Court in *Nicol* v. *Ames*, 173 U.S. 509, 514–515:

It is always an exceedingly grave and delicate duty to decide upon the constitutionality of an act of the Congress of the United States. The presumption, as has frequently been said, is in favor of the validity of the act, and it is only when the question is free from any reasonable doubt that the court should hold an act of the lawmaking power of the nation to be in violation of that fundamental instrument upon which all the powers of the Government rest. This is particularly true of a revenue act of Congress. The provisions of such an act should not be lightly or unadvisedly set aside, although if they be plainly antagonistic to the Constitution it is the duty of the court to so declare. The power to tax is the one great power upon which the whole national fabric is based. It is as necessary to the existence and prosperity of a nation as is the air he

breathes to the natural man. It is not only the power to destroy, but it is also the power to keep alive.

We cannot find that Congress has gone beyond permissible limits here.

In dealing with the scope of the taxing power the question has sometimes been framed in terms of whether something can be taxed as income under the 16th amendment. This is an inaccurate formulation of the question and has led to much loose thinking on the subject. The source of the taxing power is not the 16th amendment; it is article I, section 8, of the Constitution. It is important that these provisions be clearly understood. What is required is an understanding of fundamental principles. The familiar statement that "at this time we need education in the obvious more than investigation of the obscure" (Holmes, Collected Legal Papers, pp. 292–293), although made in a different context, is peculiarly applicable here.

The power to tax was one of the great powers granted to the National Government by the Constitution. Indeed, a glaring weakness of the Articles of Confederation was the absence of an effective taxing power and "was one of the causes that led to the adoption of the present Constitution." *Springer* v. *United States*, 102 U.S. 586, 595–596. See also The Federalist, Nos. 21, 30. It was in response to the perilous situation then existing that the Constitution conferred upon the Congress the power to tax in broad and sweeping terms. Article I, section 8, clause 1, provides:

> The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States; * * *

The authority thus granted "is exhaustive and *embraces every conceivable power of taxation.*" (Italics supplied.) *Brushaber* v. *Union Pac. R.R.*, 240 U.S. 1, 12. The power was subject to only one prohibition, namely, that no tax or duty may be laid upon exports (art. I, sec. 9, cl. 5); [6] and only two qualifications were imposed upon the manner in which the power might be exercised: (1) Duties, imposts, and excises must be "uniform throughout the United States" (art. I, sec. 8, cl. 1, *supra*); and (2) capitation and other "direct" taxes must be apportioned among the States according to population (art. I, sec. 2, cl. 3,[7] and art. I, sec. 9, cl. 4 [8]). The comprehensive and all-

[6] Article I, section 9, clause 5.—No Tax or Duty shall be laid on Articles exported from any State.

[7] Article I, section 2, clause 3.—Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons. * * *

[8] Article I, section 9, clause 4.—No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken.

inclusive character of the taxing power was thus summarized by Chief Justice Chase in *License Tax Cases*, 5 Wall. 462, 471:

Congress cannot tax exports, and it must impose direct taxes by the rule of apportionment, and indirect taxes by the rule of uniformity. Thus limited, and thus only, it reaches every subject, and may be exercised at discretion.

In *Pacific Insurance Co.* v. *Soule*, 7 Wall. 433, the Court stated (p. 446):

The taxing power is given in the most comprehensive terms. The only limitations imposed are: That *direct taxes*, including the capitation tax, shall be apportioned; that duties, imposts, and excises shall be uniform; and that no duties shall be imposed upon articles exported from any State. With these exceptions, the exercise of the power is, in all respects, unfettered.

See also *Flint* v. *Stone Tracy Co.*, 220 U.S. 107, 153–154.

Thus, where exports are not involved, the authority of Congress to impose a tax is plenary, except that direct taxes must be apportioned among the States according to population, and duties, imposts, and excises must be uniform throughout the United States. The latter requirement is not one of intrinsic equality; it is merely one of geographical uniformity, and is satisfied if the same rule for determining liability operates throughout the United States. *Knowlton* v. *Moore*, 178 U.S. 41, 83–108; *Flint* v. *Stone Tracy Co.*, 220 U.S. 107, 157; *Brushaber* v. *Union Pac. R.R.*, 240 U.S. 1, 24; *Florida* v. *Mellon*, 273 U.S. 12, 17; *Poe* v. *Seaborn*, 282 U.S. 101, 117–118; *Bromley* v. *McCaughn*, 280 U.S. 124, 138; *Steward Machine Co.* v. *Davis*, 301 U.S. 548, 583. Accordingly, since the statute now under attack satisfies the uniformity requirement, the only possible objection to its validity can be that it is not apportioned among the States according to population. But the apportionment requirement attaches only to "direct" taxes, and if the tax provided for under section 207(a)(2) is not a "direct" tax that requirement is not applicable.

The question is not as to the existence of the power to tax the receipt of gross premiums, for that power certainly exists; rather, the issue is merely whether the tax must be apportioned according to population. In other words, in taxing gross premiums, as it has the power to do, must Congress impose that tax in such manner that the burden of the tax upon companies in each State will vary with the population of such State? If the tax is a duty, impost, or excise, the rule of apportionment does not apply; only if it is a "direct" tax does that rule come into play.

The "terms duties, imposts and excises are generally treated as embracing the indirect forms of taxation contemplated by the Constitution." *Flint* v. *Stone Tracy Co.*, 220 U.S. 107, 151. Therefore, if a tax is not a direct tax, it falls within the general category of indirect taxes, and it is a matter of no moment whether its classifica-

tion be further refined as a duty, or an impost, or an excise. As was said in *Steward Machine Co.* v. *Davis*, 301 U.S. 548, 581–582:

If the tax is a direct one, it shall be apportioned according to the census or enumeration. If it is a duty, impost, or excise, it shall be uniform throughout the United States. Together, these classes include every form of tax appropriate to sovereignty. Cf. *Burnet* v. *Brooks*, 288 U.S. 378, 403, 405; *Brushaber* v. *Union Pacific R. Co.*, 240 U.S. 1, 12. Whether the tax is to be classified as an "excise" is in truth not of critical importance. If not that, it is an "impost" (*Pollock* v. *Farmers' Loan & Trust Co.*, 158 U.S. 601, 622, 625; *Pacific Insurance Co.* v. *Soule*, 7 Wall. 433, 445), or a "duty" (*Veazie Bank* v. *Fenno*, 8 Wall. 533, 546, 547; *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U.S. 429, 570; *Knowlton* v. *Moore*, 178 U.S. 41, 46).

The wide and comprehensive nature of the category of indirect taxes, in striking contrast to the very narrow range within which "direct" taxes have been limited, is abundantly demonstrated by a hundred and seventy years of history and an impressive number of decisions of the Supreme Court.

For many years after the adoption of the Constitution the term direct taxes was thought to be limited to capitation taxes and taxes upon real estate. *Hylton* v. *United States*, 3 Dall. 171; *Springer* v. *United States*, 102 U.S. 586, 602.[9] The impracticability and unfairness of the apportionment requirement were early recognized in the *Hylton* case, in which the Supreme Court held that an unapportioned annual tax upon carriages was within the power of Congress. In the course of his opinion Justice Chase stated (3 Dall. 171, 174):

It appears to me, that a tax on carriages cannot be laid by the rule of apportionment, without very great inequality and injustice. For example: suppose, two states, equal in census, to pay $80,000 each, by a tax on carriages, of eight dollars on every carriage; and in one state, there are 100 carriages, and in the other 1000. The owners of carriages in one state, would pay ten times the tax of owners in the other. A. in one state, would pay for his carriage eight dollars, but B. in the other state, would pay for his carriage, eighty dollars.

Throughout the history of the country the term "direct" taxes has been given a narrow and restrictive interpretation, and unapportioned taxes over an extremely broad range have been sustained. Thus, notwithstanding the absence of apportionment, the Supreme Court has upheld a "license" or "special" tax upon dealers in certain commodities (*License Tax Cases*, 5 Wall. 462; cf. *South Carolina* v. *United States*, 199 U.S. 437); a tax on sales at commodity exchanges (*Nicol* v. *Ames*, 173 U.S. 509); a tax on the transfer or sale of securi-

---

[9] See also 1 Story, Constitution of United States, sec. 955 (4th ed., 1873); 1 Kent, Commentaries 256; Miller, Constitution 237 (1891). Cf. Rawle, Constitution 80 (2d ed., 1829); Pomeroy, Constitutional Law, sec. 277 (3d ed., 1888); Sergeant, Constitutional Law 305 (1830); 1 Hare, American Constitutional Law 250 (1889).

ties (*Treat* v. *White*, 181 U.S. 264; *Thomas* v. *United States*, 192 U.S. 363; *Provost* v. *United States*, 269 U.S. 443); a tax on the issuance of State bank notes (*Veazie Bank* v. *Fenno*, 8 Wall. 533); a tax on manufactured tobacco having reference to its origin and intended use (*Patton* v. *Brady*, 184 U.S. 608); a tax on the manufacture and sale of oleomargarine (*McCray* v. *United States*, 195 U.S. 27); a tax on devolutions of title to real estate (*Scholey* v. *Rew*, 23 Wall. 331); a tax on the receipt of legacies (*Knowlton* v. *Moore*, 178 U.S. 41); a tax on transfers at death (*New York Trust Co.* v. *Eisner*, 256 U.S. 345); a tax on transfers inter vivos (*Bromley* v. *McCaughn*, 280 U.S. 124). In response to the contention in *New York Trust Co.* v. *Eisner*, *supra*, that the estate tax was invalid as an unapportioned direct tax upon property, the Supreme Court swept away all the logical arguments with the broad statement that "Upon this point a page of history is worth a volume of logic." 256 U.S. at 349.

Among the numerous indirect taxes imposed by Congress under article I, section 8, of the Constitution were the various income taxes levied for a period of nearly 10 years at about the time of the Civil War. Act of August 5, 1861, ch. 45, 12 Stat. 292, 309, 311; Act of July 1, 1862, ch. 119, 12 Stat. 432, 473, 475; Act of March 3, 1863, ch. 74, 12 Stat. 713, 718, 723; Act of June 30, 1864, ch. 173, 13 Stat. 223, 281, 285; Act of March 3, 1865, ch. 78, 13 Stat. 469, 479, 481; Act of March 10, 1866, ch. 15, 14 Stat. 4, 5; Act of July 13, 1866, ch. 184, 14 Stat. 98, 137, 140; Act of March 2, 1867, ch. 169, 14 Stat. 471, 477, 480; Act of July 14, 1870, ch. 255, 16 Stat. 256, 261. These taxes were not apportioned according to population; they were treated as indirect taxes and were held constitutional in a number of cases in the Supreme Court, notably in *Springer* v. *United States*, 102 U.S. 586, where the constitutional issue was fully discussed.

However, in addition to the foregoing *income* taxes, there were a number of taxes upon *gross receipts*. Thus, section 104 of the Act of June 30, 1864, 13 Stat. at 276, imposed a gross receipts tax upon express companies as follows:

Any person, firm, company, or corporation carrying on or doing an express business, shall be subject to and pay a duty of three per centum on the gross amount of all the receipts of such express business.

Similarly, section 107 of the same statute laid a tax of 5 per cent "on the gross amount of all receipts of" telegraph companies. 13 Stat. at p. 276. Again, section 108 imposed a tax of 2 per cent "on the gross amount of all receipts" with respect to theatres, operas, circuses, museums, and other public exhibitions and performances. Moreover, of particular interest here is the tax provided for with respect to gross premiums of insurance companies. Section 105 of the same statute declared that:

That there shall be levied * * * a duty of one and a half of one per centum upon the gross receipts of premiums, or assessments for insurance from loss or damage by fire or by the perils of the sea, made by every insurance company. * * *

It should be noted that these were not taxes upon income in the sense that "gain" or "profit" might be an essential aspect of the subject matter taxed. They were simply taxes upon gross receipts, just as a sales tax is often measured by gross receipts from the goods sold and is applicable regardless of the profitable or unprofitable nature of the business. The foregoing gross receipts taxes were unapportioned, and their validity was challenged. In *Pacific Insurance Company* v. *Soule*, 7 Wall. 433, the Supreme Court sustained the tax upon insurance companies. It rejected the contention that the contested exaction was a direct tax that had to be apportioned. In pointing out the bizarre and inequitable consequences that would flow from the apportionment of the tax upon gross premiums the Court stated (p. 446):

The consequences which would follow the apportionment of the tax in question among the States and Territories of the Union, in the manner prescribed by the Constitution, must not be overlooked. They are very obvious. Where such corporations are numerous and rich, it might be light; where none exist, it could not be collected; where they are few and poor, it would fall upon them with such weight as to involve annihilation. It cannot be supposed that the framers of the Constitution intended that any tax should be apportioned, the collection of which on that principle would be attended with such results. The consequences are fatal to the proposition.

These words are equally applicable to the "special tax of 1 per cent" (S. Rept. No. 1631, 77th Cong., 2d Sess., p. 151) imposed by section 207 (a) (2) of the 1939 Code which is here under attack.

Similarly, section 27 of the Act of June 13, 1898, ch. 448, 30 Stat. 448, 464, imposed a tax of one-quarter of one per cent upon the gross receipts, in excess of $250,000, from the refining of sugar or petroleum or the operation of a pipeline. There was no provision for apportionment, but the tax was nevertheless sustained in *Spreckels Sugar Refining Co.* v. *McClain*, 192 U.S. 397. True, the statute had referred to the exaction as "a special excise tax." But its validity could not have turned upon a mere label. It should be perfectly clear that if the power exists, the name applied to a particular tax is of no consequence. The validity of an exercise of congressional power cannot depend upon the verbal tag affixed to it. "The name of the tax is unimportant." *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U.S. 429, 580–581.

We think it clear that wholly apart from the 16th amendment section 207 (a) (2) is entirely within the all-inclusive taxing power of Congress under article I, section 8, and that the crippling and in-

equitable apportionment requirement has no application here. Nevertheless, since the 16th amendment is sometimes loosely and incorrectly treated as imposing certain limitations or restrictions upon the taxing power, we deem it important to show just what part the 16th amendment plays in relation to the taxing power.

The story of the 16th amendment properly begins with *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U.S. 429, 158 U.S. 601. Sections 27–37 of the Act of Congress received by the President April 15, 1894, and which became law without his approval (ch. 349, 28 Stat. 509) provided for a comprehensive general tax upon net income. There was no apportionment, and a sharply divided Court held the Act invalid in two respects that are material here. It held that to the extent that the tax was upon rents or income from real estate and to the extent that it was upon income from invested personal property, it was for present purposes equivalent to a direct tax upon the real estate or the invested personal property and was therefore invalid for want of apportionment. In other words, the apportionment requirement was held applicable by reason of the *source* of those two classes of income, since in the opinion of the majority, the income from those two sources was so closely identified with the sources themselves that a tax upon the income had to comply with the requirements applicable to a tax upon the property from which it was derived. It was only in this limited respect that the lack of apportionment was held fatal. The Court made it plain beyond any doubt that it was not reaching any such result in respect of a tax on "professional receipts," 157 U.S. at 579, or "on gains or profits from business, privileges, or employments," 158 U.S. at 635. The narrow scope of the holding in the *Pollock* case has been repeatedly recognized. See *Nicol* v. *Ames*, 173 U.S. 509, 519–520; *Knowlton* v. *Moore*, 178 U.S. 41, 80; *Spreckels Sugar Refining Co.* v. *McClain*, 192 U.S. 397, 413; *Flint* v. *Stone Tracy Co.*, 220 U.S. 107, 148.

But in spite of the limited scope of the holding in the *Pollock* case Congress was prevented from imposing a general tax upon *all* income without taking into account its obligation to provide for apportionment to the extent at least that the income was derived from property. It was to overcome this impossible situation that the 16th amendment was adopted. It provides:

The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration.

The 16th amendment thus merely provides that regardless of the source of the income no apportionment is required. It is no new grant of power to tax income, "an authority already possessed and never

questioned." *Brushaber* v. *Union Pac. R.R.*, 240 U.S. 1, 17–18. Nor was it necessary in order to lift the apportionment requirement in respect of most types of income; for the apportionment requirement, even under the *Pollock* case, applied only to income from property. But it was necessary to remove the apportionment requirement as to income from property and to make clear that, whatever the source, income could be taxed without the crippling effect of apportionment. As the Court in the *Brushaber* case said (240 U.S. at 18) : "[T]he whole purpose of the Amendment was to relieve all income taxes when imposed from apportionment from a consideration of the source whence the income was derived."

In *Stanton* v. *Baltic Mining Co.*, 240 U.S. 103, the Supreme Court again made it clear that (pp. 112–113) "the Sixteenth Amendment conferred no new power of taxation but simply prohibited the previous complete and plenary power of income taxation possessed by Congress from the beginning from being taken out of the category of indirect taxation to which it inherently belonged and being placed in the category of direct taxation subject to apportionment by a consideration of the sources from which the income was derived, that is by testing the tax not by what it was—a tax on income, but by a mistaken theory deduced from the origin or source of the income taxed." The Court condemned as improper an approach to the 16th amendment which treated it as a new grant of power with the consequence that limitations in that new grant were a restriction upon its exercise. The 16th amendment merely made it clear that income taxes, regardless of the source of the income, were not subject to the apportionment requirement. It in no way subtracted from or diminished the all-inclusive power already provided for in article I, section 8. It would be ironic indeed if the amendment, which was intended to enlarge the preexisting taxing power by unfettering it from a crippling restriction, were to be interpreted so as to create new limitations upon its exercise. In *Stanton* v. *Baltic Mining Co.*, *supra*, the Court overrode an objection to the 1913 income tax as applied to a mining company where the taxpayer complained that the allowance of a depletion deduction in the amount of only $150,000 in the face of actual depletion of $750,000 converted the tax into one upon property which was therefore invalid because not apportioned. The Court brushed the argument aside, sustaining the tax not only with the assistance of the 16th amendment, but also upon the ground that it was valid "independently of the effect of the operation of the Sixteenth Amendment." It cited *Stratton's Independence* v. *Howbert*, 231 U.S. 399, in support of its conclusion that the tax could be sustained as a true excise on the results of the business of carrying on mining operations. 240 U.S. at 114. But while it is true that the tax in *Stratton's*

*Independence* v. *Howbert* was *eo nomine* an excise, such was not the case of the 1913 income tax sustained in the *Stanton* case. Thus, the challenged tax herein is similarly sustainable as an excise on carrying on an insurance business, and is certainly as much an indirect tax as was the one upheld without apportionment in *Pacific Insurance Co.* v. *Soule*, 7 Wall. 433. The power of Congress to impose the tax without apportionment depends upon whether it in fact falls within the broad category of indirect taxes and not upon whether Congress has used the magic words "excise" or "duty" or "impost." *Steward Machine Co.* v. *Davis*, 301 U.S. 548, 581–582. Cf. *Wisconsin* v. *J. C. Penny Co.*, 311 U.S. 435, 443–444; *Lawrence* v. *State Tax Commission*, 286 U.S. 276, 280.

Since we have concluded that the "special tax" imposed by section 207(a)(2) upon mutual insurance companies (other than life or marine) is fully authorized by article I, section 8, and that it is not a "direct" tax requiring apportionment, it becomes unnecessary to consider whether the 16th amendment effectively dispenses with the apportionment requirement in this case. Nevertheless, even if it were necessary to make that inquiry, we think there is much force to the contention that even if the apportionment requirement were otherwise applicable it does not apply here by virtue of the 16th amendment, and that the failure of Congress to provide for deduction of underwriting losses does not prevent the 16th amendment from dispensing with the apportionment requirement here. It is familiar doctrine that deductions are a matter of legislative grace (*Stanton* v. *Baltic Mining Co.*, 240 U.S. 103; *Burnet* v. *Thompson Oil & Gas Co.*, 283 U.S. 301, 304; *Helvering* v. *Independent Life Ins. Co.*, 292 U.S. 371, 381; *New Colonial Co.* v. *Helvering*, 292 U.S. 435, 440; *White* v. *United States*, 305 U.S. 281, 292; *Commissioner* v. *Sullivan*, 356 U.S. 27, 28), and it seems unlikely that there is a *constitutional* requirement based upon the 16th amendment calling for the deduction which petitioner insists is indispensable to the validity of the unapportioned tax. However, that is an issue that we need not reach.

Finally, we recur to the statement in *Nicol* v. *Ames*, 173 U.S. 509, 514–515, to the effect that the presumption is in favor of the validity of an act of Congress, "and it is only when the question is free from any reasonable doubt that the court should hold an act of the law-making power of the nation to be in violation of that fundamental instrument upon which all the powers of the Government rest." Similarly, in *Ogden* v. *Saunders*, 12 Wheat. 213, 270, the Supreme Court said:

It is but a decent respect due to the wisdom, the integrity and the patriotism of the legislative body, by which any law is passed, to presume in favor of its validity, until its violation of the Constitution is proved beyond all reasonable doubt.

The same thought has been expressed in sweeping terms on a number of occasions. See, e.g., *Sinking Fund Cases*, 99 U.S. 700, 718 ("Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt."); *Trade-Mark Cases*, 100 U.S. 82, 96 ("[A] due respect for a co-ordinate branch of the government requires that we shall decide that it has transcended its powers only when that is so plain that we cannot avoid the duty."); *Legal Tender Cases*, 12 Wall. 457, 531 (" '[A]n act of the legislature is not to be declared void unless the violation of the Constitution is so manifest as to leave no room for reasonable doubt * * * ' ".).

As the Court said further in *Nicol* v. *Ames, supra* at 515–516:

In deciding upon the validity of a tax with reference to these [constitutional] requirements, no microscopic examination as to the purely economic or theoretical nature of the tax should be indulged in for the purpose of placing it in a category which would invalidate the tax.

We think that the statute under attack is plainly within the power of Congress. But even if we were less sure, the foregoing standards for the adjudication of constitutional issues would compel us to uphold the tax. It may often be possible to generate doubts about the validity of a measure by piecing together words or concepts culled from various opinions or other writings. But such doubts cannot justify declaring an act of Congress unconstitutional while merely paying lip service to the presumption of validity. That presumption is vital and real, and in such circumstances our duty is to uphold the statute, if there is any reasonable basis whatever for such action. That there is a most ample basis therefor in this case abundantly appears from the materials that we have considered above. We hold that section 207(a)(2) is constitutional, and that the deficiency determined by the Commissioner must be approved.

Reviewed by the Court.

*Decision will be entered for the respondent.*

---

MURDOCK, *J.*, concurring: Although the question of jurisdiction was decided correctly by an order of Judge Train, who heard this case, and is the subject of a footnote only in the majority opinion, nevertheless, since it is dealt with at great length in a dissent, it may be well to discuss this issue briefly. "The amount shown as the tax by the taxpayer upon his return" in section 271(a) must be read in the light of the rest of the Code in order to determine the intention of Congress, and when so read it seems reasonably clear that Congress meant the tax shown *to be due* by the taxpayer upon his return. *John Moir*, 3 B.T.A. 21. It is generally recognized that Congress intended the return to be a method whereby the taxpayer would make a self-

assessment of the amount of tax which he agrees or concedes is due and which he intends to pay without any action by the tax-collecting Commissioner. Here, the taxpayer does not agree or concede that any amount of tax is due but, on the contrary, states in a letter accompanying the return that no tax is lawfully due and it will not pay as tax the contested amount shown in the calculation on the return. The return is in effect a "no-tax" return because the taxpayer, in connection with the filing of that return, states that no tax is lawfully imposed upon it. The taxpayer was not self-assessing any tax and it was thus proper for the Commissioner to determine a deficiency in the contested amount so that he could eventually assess and collect the amount as a tax. These same thoughts are discussed in and supported by the cases cited in the footnote in the prevailing opinion.

TURNER, HARRON, OPPER, TIETJENS, BRUCE, ATKINS, and MULRONEY, *JJ.*, agree with this concurring opinion.

---

TURNER, *J.*, concurring: It is my opinion that the tax imposed by section 207 (a) (2) is a tax on income, and consequently any apportionment requirement is obviated by the 16th amendment. If I am wrong in that view, and in the disposition of the case it is necessary to consider the question of constitutionality apart from the 16th amendment, I concur in what is said in the majority opinion.

HARRON, TIETJENS, FISHER, and ATKINS, *JJ.*, agree with this concurring opinion.

---

PIERCE, *J.*, dissenting: Because of the importance of this case, in its bearing upon the statutory prerequisites to this Court's obtaining jurisdiction of income tax controversies, and also in its bearing upon the powers and duties of the Court in dealing with the issues presented in cases properly before it, I believe it appropriate to set forth the reasons for my dissent from the majority opinion. Such dissent is based on three principal grounds:

## *I.*

This Court does not, in my opinion, have jurisdiction to decide the present case, on its merits. And I believe that the motion filed by respondent, to dismiss the case for lack of jurisdiction, should have been granted.

The reasons for such position are that, as is hereinafter shown, the Commissioner did not make any adjustment whatever, either to the amount of the taxable income reported by the petitioner corporation [1]

---

[1] A statutory liquidator of Penn Mutual Indemnity Company is now the substituted petitioner herein.

on the income tax return which it filed for the taxable year involved, or to the applicable rate of tax which petitioner applied, or to the amount shown as the tax by the petitioner on said return. Thus, it is evident that the Commissioner has not herein determined a "deficiency" within the meaning of section 271(a) of the 1939 Code; [2] that, in the absence of such determination by the Commissioner, there is no "deficiency" available for "redetermination" by this Court under section 272(a)(1); [3] and that there is no jurisdiction in this Court, under section 1101,[4] to adjudicate the merits of the controversy.

Moreover, as hereinafter further shown, the present controversy is not based on any contention of either party, that the Commissioner did make any determination that the amount of the tax imposed by chapter 1 of the Code *exceeds* the amount "shown as the tax by the taxpayer upon his [its] return." The controversy is based, rather, on a "position" expressed by petitioner's counsel in a letter addressed to the director of internal revenue, that notwithstanding the completeness and correctness of the return in its relation to the applicable statute, payment of the tax was refused solely on the ground that such statute is unconstitutional. Section 272(a)(1) makes no provisions for adjudication by this Court of a case in which the tax has been completely and correctly returned, and in which no "deficiency" within the meaning of section 271(a) has been determined by the Commissioner.

The facts material to this jurisdictional question are as follows. The petitioner filed a "U.S. Mutual Insurance Company Income Tax

---

[2] SEC. 271. DEFINITION OF DEFICIENCY.

(a) IN GENERAL.—As used in this chapter in respect of a tax imposed by this chapter [chapter 1—income tax], "deficiency" means the amount by which the tax imposed by this chapter *exceeds* the excess of—

    (1) the sum of (A) the amount shown as the tax by the taxpayer *upon his return,* if a return was made by the taxpayer and an amount was *shown as the tax* by the taxpayer *thereon,* plus (B) the amounts previously assessed (or collected without assessment) as a deficiency, over—

    (2) the amount of rebates, as defined in subsection (b)(2), made. [Emphasis supplied.]

In the instant case, there were no amounts previously assessed as a deficiency, and no rebates.

[3] SEC. 272. PROCEDURE IN GENERAL.

(a)(1) PETITION TO BOARD OF TAX APPEALS [now called Tax Court of the United States].—If in the case of any taxpayer, *the Commissioner determines that there is a deficiency* [which term is defined in section 271(a)] in respect of the tax imposed by this chapter, the Commissioner is authorized to send notice of *such deficiency* to the taxpayer by registered mail. Within ninety days after such notice is mailed * * * the taxpayer may file a petition with Board of Tax Appeals for a *redetermination of the deficiency.* * * * [Emphasis supplied.]

[4] SEC. 1101. JURISDICTION.

The Board and its divisions shall have such jurisdiction as is conferred on them by chapters 1 [income tax], 2 [additional income taxes], 3 [estate tax], and 4 [gift tax] of this title [Internal Revenue Title], by Title II and Title III of the Revenue Act of 1926, 44 Stat. 9 [relating to income tax and estate tax], or by laws enacted subsequent to February 26, 1926.

Return" for the taxable year involved, on which it showed: Gross income taxable under section 207(a) (2) (A) of the 1939 Code (including "net premiums" of $1,239,884.49)—$1,256,675.70; rate of tax— 1 per cent of the above gross income; and total income tax owing— $12,566.76. Attached to said return was a transmittal letter, signed by petitioner's general counsel who was not a signatory to the return and who is not shown to have been an officer of the petitioner, which reads in material part as follows:

Director of Internal Revenue
*Philadelphia, Pa.*
Dear Sirs:
    *Enclosed herein find return on Form 1120 M * * *.*
    While the return is made in the form as required, this company, as indicated in its last year's return *takes the position* that the imposition of an *income tax against this company based upon its receipts of net premiums*, as indicated in line 20 of that return, *is invalid and unconstitutional.*
    * * * Therefore, under the circumstances, *this company will not, under my advice, issue a check to the United States covering any part of the income tax* based upon what we deem an invalid tax, to wit, the imposition of a 1% so-called *income tax upon the net premiums* * * * indicated in the return. [Emphasis supplied.]
         *         *         *         *         *         *         *
        Respectfully yours,

                                                /s/ PETER P. ZION
                                                    *General Counsel*

Thereafter, the Commissioner mailed to the petitioner a notice in the usual form of a deficiency notice. In this, he gave recognition to the return as filed; he made no adjustment whatever to any of the items therein pertaining to the section 207(a) (2) (A) tax; and he designated, as a "Deficiency in income tax," that portion of the amount shown as the tax on the return, which had not been administratively assessed. His explanation and computation of this so-called "Deficiency in income tax," was:

Adjustments [under sec. 207(a) (2)]—1952

Gross income *disclosed by return*_____ $1,256,675.70
Adjustments to gross income_____ *None*
                                                                    _____
Gross income as adjusted_____ 1,256,675.70
         *         *         *         *         *         *         *

Computation of Tax—1952

Gross amount of income_____ $1,256,675.70
Income tax liability computed at 1%_____ 12,566.76
Balance of income tax liability_____ 12,566.76
*Tax assessed* on return account #959005_____ *None*
                                                                    _____
Deficiency in income tax_____ $12,566.76
[Emphasis supplied.]

This Court has heretofore held in *Hudson-Dugger Co.*, 7 B.T.A. 357, that notwithstanding that the notice mailed to a taxpayer is in the *form* of a notice of deficiency, it is not sufficient to give this Court jurisdiction, if the so-called deficiency set forth therein is not, in reality, a "deficiency" within the meaning of section 271(a), but is merely a statement as to the portion of the returned tax which has not been administratively assessed. The Court there said:

It should be noted that the definition of deficiency in the statute does not set out as a requirement that the taxes shown due on the return must be assessed, but merely says "the amount shown as the tax by the taxpayer upon his return." * * *

This Court, of course, has no jurisdiction or control over the assessment or collection of taxes.

Other decisions of this and other courts, to the effect that the mailing of a so-called notice of deficiency is not sufficient to give this Court jurisdiction, if the Commissioner has not actually determined a "deficiency" within the meaning of section 271(a), include: *New York Trust Co. et al.*, 3 B.T.A. 583, 587; *Stanley A. Anderson*, 11 T.C. 841; *McConkey v. Commissioner*, 199 F. 2d 892, 894 (C.A. 4), affirming an order of dismissal of this Court, certiorari denied 345 U.S. 924; *Bendheim v. Commissioner*, 214 F. 2d 26 (C.A. 2). Also, it has been held that jurisdiction cannot be conferred either by consent of the parties or by estoppel, where jurisdiction does not exist by statute, *National Builders, Inc. v. Secretary of War*, 16 T.C. 1220, 1224–1225; *Accessories Manufacturing Co.*, 12 B.T.A. 467; *Theodore Stanfield*, 8 B.T.A. 787; *William C. Shanley, Jr.*, 7 B.T.A. 521, 522; see also *E. C. Newsom*, 22 T.C. 225, 228, affirmed per curiam 219 F. 2d 444 (C.A. 5). Jurisdiction must be established affirmatively, *Herbert Brush Mfg. Co.*, 22 B.T.A. 646, 647; *First Bond & Mortgage Co.*, 21 B.T.A. 1; *Consolidated Companies, Inc.*, 15 B.T.A. 645, 651–652; see also 9 Mertens, Law of Federal Income Taxation sec. 50.09. And this Court must determine that it has jurisdiction, even though the existence of jurisdiction has not been questioned by the parties, *National Committee to Secure Justice, Etc.*, 27 T.C. 837, 839; *National Builders, Inc. v. Secretary of War, supra.* Moreover, this Court has no power to extend the statutory limits of its jurisdiction, so as to afford to a taxpayer the procedural advantages of litigating in this Court; for the extent of its jurisdiction is a matter of policy which is solely within the control of Congress. As was aptly said by the Court of Appeals for the Second Circuit, in *Superheater Co. v. Commissioner*, 125 F. 2d 514, 515:

a taxpayer can invoke the jurisdiction of the Board [now the Tax Court of the United States] only when the Commissioner has determined a deficiency. This limitation inherent in Sec. 274 (a) (b) (e) and (g) of the Revenue Act of 1926

[which provisions are substantially the same as those in section 272 of the 1939 Code] * * * has since been preserved in all material respects and the courts have given it effect. * * *

 *      *      *      *      *      *      *

it seems clear that until the jurisdiction of the Board is further enlarged whatever procedural convenience might be attained by having a formal re-determination * * * [by the Board] must give way to the greater necessity for recognizing and giving effect to the limited statutory jurisdiction of the Board.

The fact that petitioner refused payment of the returned tax for reasons satisfactory to it, and the fact that it has taken the position that the applicable statute is unconstitutional, are wholly irrelevant in determining whether the essential prerequisites to this Court's acquiring jurisdiction have been met. The Congress has, in sections 271 (a) and 272 (a) (1), established *objective standards* governing this Court's jurisdiction, which are based solely on the return as filed, and upon the Commissioner's determination of a "deficiency" in respect of the "amount shown as the tax by the taxpayer *upon his [its] return.*" Since these statutes are free from ambiguity, there is no room for a judicial construction based upon *subjective positions* adopted by the petitioner or its counsel; and any such construction would violate the expressed policy of Congress.

Nor do the cases cited in the second footnote of the majority opinion,[5] lend support to the Court's denial of respondent's motion to dismiss the case for lack of jurisdiction. These cases were decided in a setting, and on the basis of facts and circumstances, wholly different from those here present; and none of them involved a contention that the controlling statute was unconstitutional. The first five of these cited cases arose under an earlier practice, now obsolete, where the Commissioner had denied *claims in abatement* in which the tax-payer had sought the benefit of exemptions, credits, or deductions provided *by the statute* for use in suitable situations; and the question presented was whether the amount of the *tax returned* was the gross tax shown, or the net tax after taking into consideration the claimed adjustments. Such claims in abatement have now been abolished. Sec. 273 (j), 1939 Code. Others of said cited cases, i.e., *Powell Coal Co.* and *Taylor* cases, involved in one instance a situation pertaining to the effect of an amended return, and in the other instance a situation where the taxpayer had filed no return whatever. This Court, in the later case of *John A. Gebelein, Inc.*, 37 B.T.A. 605, specifically distinguished this line of cases cited by the majority, as follows:

If the freedom from liability were alleged to be attributable to a statutory provision legislatively granting exemption to a described class, such as personal

---

[5] The cases cited by the majority are: *Continental Accounting & Audit Co.*, 2 B.T.A. 761, 763–764; *John Moir*, 3 B.T.A. 21, 22; *United States Fidelity & Guaranty Co.*, 5 B.T.A. 23, 26; *Powell Coal Co.*, 12 B.T.A. 492, 497; *Edward J. Lehmann*, 21 B.T.A. 664, 671; *Fred Taylor*, 36 B.T.A. 427, 429.

service corporations, or building and loan corporations, it would be clear that a determination had been made which upon proper notice would be the foundation of a proceeding within the Board's jurisdiction, *Continental Accounting & Audit Co.*, 2 B.T.A. 761, and *Fred Taylor*, 36 B.T.A. 427. See also I.T. 2400, VII-1 C.B. 138. But the claim here is not for statutory exemption, but for constitutional immunity, and, since for another reason the notice was ineffective to support a petition, consideration must be reserved as to whether the question is the same. * * *

And finally the majority, in its acceptance of jurisdiction in the instant case, has failed to observe the distinction between a controversy involving an *originally returned tax* in respect of which the Commissioner has not determined a "deficiency" within the meaning of section 271(a), and a controversy involving a "deficiency" administratively determined in respect of such originally returned tax. The procedures for handling these two classes of liability are entirely different. As to an *originally returned tax*, the Commissioner is authorized and required to assess the same, without notice to the taxpayer. See section 3640, 1939 Code; and the even more specific provisions of section 6201(a)(1), 1954 Code. The statute specifically prohibits *any court* from restraining the assessment or collection of the same. Sec. 3653, 1939 Code. And the taxpayer's remedy, in seeking relief from an originally returned tax which he believes to be illegal, lies in payment of the tax, filing a claim for refund, and bringing a suit in a District Court or in the Court of Claims, to get his money back. *Dodge* v. *Osborne*, 43 App. D.C. 144, affd. 242 U.S. 118. See also footnote 10 in *Flora* v. *United States*, 357 U.S. 63 (1958).

On the other hand, as regards a *deficiency* determined by the Commissioner in respect of the originally returned tax, section 272(a)(1) provides for giving notice of same to the taxpayer, and for the filing of a petition to this Court for a "redetermination of the deficiency." After the filing of such a petition, assessment of the deficiency is stayed until this Court's decision has become final; and, notwithstanding the provisions of section 3653, earlier assessment of the deficiency (as distinguished from the original tax) may be enjoined by a proceeding in the proper court.

In the instant case, the majority of the Court has accepted jurisdiction over a controversy as to the legality of the originally returned tax, which was completely and correctly reported by petitioner on its return, and in respect of which the Commissioner has not determined a "deficiency" within the meaning of section 271(a). The effect of this is to prevent prompt assessment of the correctly returned tax, notwithstanding the provisions of section 3653; and to disturb the existing balance between the jurisdictions of the various courts which are authorized to adjudicate tax controversies.

As before stated, I think the respondent's motion to dismiss the case for lack of jurisdiction, should have been granted.

## II.

The second principal ground for my dissent from the majority opinion is that, assuming that the Court does have jurisdiction, it has failed to decide the issues raised by the pleadings.

The petitioner herein assigned only one error which, though stated rather indirectly, may fairly be construed to present the question of whether section 207(a)(2) of chapter 1 of the 1939 Code is constitutional, in its imposition of an *income tax* on the "net premiums" received by the petitioner, notwithstanding that the company suffered a substantial loss in the operation of its business. Inherent in this assignment of error and also in the petition as a whole, are the following questions which should have been answered by the Court, in passing on said constitutional question: (1) Whether the principal subject of the tax (i.e., the "net premiums" received by the petitioner indemnity company), are in truth and substance "income," either gross or net, irrespective of their being so labeled in the statute; (2) whether, if such premiums are *not* "income," they constitutionally can be taxed "as income," under said section 207(a)(2) of the Code; and (3) whether, if such premiums *do* constitute "income," they constitutionally can be taxed on a "gross income" basis, as distinguished from a "net income" basis, notwithstanding that the petitioner suffered a substantial loss for the taxable year in the operation of its indemnity business. It is significant that the petitioner's refusal to pay the challenged tax was based on similar grounds, as is shown by the statements contained in the above-mentioned transmittal letter for its return.

The majority opinion has not decided any of these questions. Rather, it devotes principal attention to the extent of the *plenary power* of Congress under article I, section 8, clause 1 of the Constitution, to lay "Taxes, Duties, Imposts and Excises," without apportionment; and to whether "the crippling and inequitable apportionment requirement has * * * application here."

But in the instant case which involves liability for *income tax*, it is unnecessary to consider whether Congress had power to lay such tax *without apportionment*, for such power is specifically granted under article I of the Constitution, as modified by the *16th amendment*. Nor does this case involve the *power* of Congress to lay duties, imposts, and excises without apportionment, for the only tax which has here been imposed upon the petitioner is one "upon the *income* of every mutual insurance company [other than those specifically

excluded]" which tax is measured at 1 per cent on the "gross amount of *income* from interest, dividends, rents and net premiums." (Emphasis supplied.)    Thus the issue here is not as to the *power* of Congress to lay taxes, but rather the validity of the *particular tax here laid*, in its *application* to the facts of the instant case.

Notwithstanding, that the tax here involved was laid on *gross income* under chapter 1 (relating to income taxes), that it was returned by petitioner on the prescribed Treasury form entitled "U.S. Mutual Insurance Company Income Tax Return," and that the so-called deficiency upon which the majority bases its jurisdiction is designated a "Deficiency in income tax," the majority opinion has nowhere determined that the "net premiums" subjected to tax actually were *income.* Nor has the majority opinion determined whether the income tax here imposed could validly be imposed on *gross income,* as distinguished from *net income.*    Indeed, it is stated in the latter portion of the majority opinion:

it seems unlikely that there is a *constitutional* requirement based upon the 16th amendment calling for the deduction which petitioner insists is indispensable to the validity of the unapportioned tax.  *However, that is an issue that we need not reach.*  [Emphasis in last sentence supplied.]

In *Eisner* v. *Macomber*, 252 U.S. 189, the Supreme Court said:

This case presents the question whether, by virtue of the Sixteenth Amendment, Congress has the power to tax, *as income*, of the stockholder and without apportionment, a stock dividend * * *

It arises under the Revenue Act of September 8, 1916 * * * which, in our opinion, nothwithstanding a contention of the government that will be noticed), *plainly evinces the purpose of Congress* to tax stock dividends *as income* * * *

\*          \*          \*          \*          \*          \*          \*

In order, therefore, that the clauses cited from article 1 of the Constitution may have proper force and effect, save only as modified by the amendment [16th amendment], and that the latter also may have proper effect, *it becomes essential to distinguish between what is and what is not "income,"* as the term is there used, and to apply the distinction, as cases arise, *according to truth and substance, without regard to form.*  Congress cannot by any definition it may adopt conclude the matter, since it cannot by legislation alter the Constitution, from which alone it derives its power to legislate, and within whose limitations alone that power can be lawfully exercised.  [Emphasis supplied.]

The principle of the *Macomber* case is still in effect, notwithstanding the expressed but unsuccessful attempt of the Government, in *Helvering* v. *Griffiths*, 318 U.S. 371, to have the *Macomber* case overruled. And, so long as such principle continues in force, it should be followed and applied by this Court.

In my view, the Court should have decided, one way or the other, whether the "net premiums" herein taxed as *gross income,* are (as stated in the *Macomber* case) "income * * * according to truth and

substance, without regard to form." And, if the majority had determined that such premiums *are not income*, it should have decided whether they constitutionally can, under an *income tax statute*, be taxed as *income*. If on the other hand the majority had determined that said premiums *are income*, it should further have decided whether they constitutionally can be taxed under an *income tax* statute, on a *gross income* basis as distinguished from *net income* basis, under the particular circumstances of this case.

It is well settled that, under our judicial system, courts act only on "cases and controversies," involving issues which have been submitted to them by adverse parties. *Old Colony Tr. Co.* v. *Commissioner*, 279 U.S. 716. The present parties have a right to expect that the income tax questions presented in the instant case, would be decided.

I think it inappropriate for me, in this dissenting opinion, to express my views on these questions which the majority, in its opinion, has not decided.

## *III.*

The third and final principal ground for my dissent is that, assuming this Court has jurisdiction to determine *income tax liability* herein, it does not, in my opinion, have jurisdiction to sustain the challenged tax as an *excise*, as the majority has done. The majority opinion states: "Thus, the challenged tax herein is * * * sustainable *as an excise on carrying on an insurance business,* * * *"" (Emphasis supplied.)

But in the instant case, no excise tax has been *laid*, or been *returned*, or been *determined* to be owing. Nor has any issue regarding liability for an *excise* tax been raised by the pleadings.

The challenged tax is, as before shown, imposed under section 207(a)(2) of chapter 1 of the 1939 Code, which chapter is entitled "Income Tax"; and subsection (a) of said section provides:

(a) IMPOSITION OF TAX.—There shall be levied, collected and paid for each taxable year upon the *income* of every mutual insurance company [other than as specifically excepted] * * * a tax computed under paragraph (1) or paragraph (2) whichever is the greater * * * [Emphasis supplied.]

Also, as hereinbefore shown, the prescribed Treasury form on which the tax was returned by the petitioner was entitled "U.S. Mutual Insurance Company Income Tax Return (Form 1120M)"; and the only tax liability determined by the Commissioner was stated, in his so-called notice of deficiency, to be a "Deficiency in income tax."

In such circumstances, it is obvious that section 207(a)(2), both by its own terms and as interpreted and applied by the Commissioner of Internal Revenue "plainly evinces [to use the words employed in *Eisner* v. *Macomber, supra*] the purpose of Congress to tax * * *

[the subjects therein specified, including "net premiums"] as income"; and that no question as to the petitioner's liability for any *excise tax*, has either been presented to this Court, or is properly before it.

As regards the majority's emphasis on the *power* of Congress to impose an excise tax on the net premiums without apportionment, the Supreme Court aptly stated in *Helvering* v. *Griffiths, supra*, at 394: "Under our judicial tradition we do not decide whether a tax may constitutionally be laid until we find that Congress has laid it."

Moreover, this Court has no jurisdiction or authority to determine liabilities for excise taxes on the carrying on of a business. No such jurisdiction is conferred by section 1101 of the 1939 Code (see footnote 4), wherein the scope and limits of the jurisdiction of this Court are specifically defined. Also, subtitle A of the Internal Revenue Code of 1939, which is designated "Taxes Subject to the Jurisdiction of the Board of Tax Appeals," does not include excise taxes on carrying on a business. The imposition of excise taxes on business is provided for in subtitles B and C; and as to such excises this Court has not been given jurisdiction.

In my view, the majority's above-mentioned holding that "the challenged tax herein is * * * sustainable *as an excise on carrying on an insurance business*" (emphasis supplied) is outside the limits of this Court's statutory jurisdiction.

WITHEY, *J.*, agrees on point *I* only of this dissent.

————

TRAIN, *J.*, dissenting. I respectfully dissent.

In my opinion, section 207(a)(2) is unconstitutional as applied to the taxpayer here.

Although disagreeing with the conclusion reached by the majority opinion, I agree with the analysis of the problem contained therein, and I believe that the opinion provides a significant service in clearing away certain misconceptions concerning the nature and scope of the Federal taxing power. Certainly, the 16th amendment did not create a new subject for taxation. The power to tax income had existed from the beginning. Nor did the amendment provide a new limitation upon the exercise of that power. The amendment does no more and no less than its plain words say, namely, that taxes on incomes regardless of source may be imposed without apportionment.

Despite this fact, I think it fair to say that there is a widespread belief, not without support in the case law, that the 16th amendment in some fashion prohibits Congress from levying an income tax on anything which is not income, and that a tax so levied is invalid.

For example, it is not an uncommon assumption that in taxing the income of a manufacturer Congress must, by virtue of the 16th amendment, permit an adjustment for cost of goods sold. This example may be multiplied by a number of other related situations involving recovery of capital, adjustments for basis, allowance for losses, and so forth. With respect to all of these, there has been an implicit assumption on the part of many that failure to permit an appropriate adjustment for such items in computing taxable income would be invalid because the result is simply not "income" within the meaning of the 16th amendment. A case in point is our own decision in *Lela Sullenger*, 11 T.C. 1076 (1948), where we declared at page 1077:

Section 23 makes no provision for the cost of goods sold, but the Commissioner has always recognized, as indeed he must stay within the Constitution, that the cost of goods sold must be deducted from gross receipts in order to arrive at gross income. No more than gross income can be subjected to income tax upon any theory. * * *

Again, in 1 Mertens, Law of Federal Income Taxation sec. 5.06, it is declared:

While there has been considerable theoretical difficulty in determining when an increment in capital has been realized so as to be taxable, there is substantial agreement that amounts received as a return of capital or investment are not income within the general meaning of that term and *may not be taxed under the Sixteenth Amendment.* * * * [Emphasis supplied.]

So stated, this reasoning is without basis in the Constitution as is ably demonstrated by the majority opinion. Once it has been determined that a particular tax is imposed on something which is not income, that determination in and of itself decides nothing insofar as the constitutional validity of the tax is concerned. The inquiry must be pushed further. A tax imposed on that which is not income is nonetheless valid *unless it is a direct tax unapportioned.* Thus, the key question is whether the tax is direct or indirect. If it is indirect, as decided by the majority in the instant case, then it is constitutionally irrelevant whether or not the tax is limited to "income." Moreover, if there is no requirement implicit in the 16th amendment limiting Congress to a tax on "income" only, I do not believe that Congress by simply denominating a certain tax as an "income tax" can be considered to have created such a limitation. Such a denomination may be material, as a matter of statutory construction, in determining whether or not Congress intended to include a certain item in the tax base, but it would be immaterial in determining whether the inclusion of the item exceeded the constitutional power of Congress to tax.

Accepting this analysis as correct, a case such as that before us here may be approached properly in either of two ways. First, the initial

inquiry may be to whether the tax is direct or indirect. If found to be the latter, then the inquiry need proceed no further and the tax is valid, assuming uniformity of application. If, on the other hand, the tax is found to be direct under this same approach, then and only then is it necessary to determine whether it is a tax on "income" and, thus, by virtue of the 16th amendment not subject to the requirement of apportionment. The second approach, equally proper under this analysis, is to inquire first whether the tax is levied upon "income" within the meaning of the 16th amendment. If it is, then again we need pursue the matter no further because, regardless of the source of the income, the tax is relieved of the requirement of apportionment, and it makes no difference whether it is direct or indirect. If found not to be levied on income, then it is necessary to determine whether the tax is direct and thus subject to the requirement of apportionment or indirect and thus valid irrespective of apportionment.

All of these premises assume the tax in question to meet the requirement of uniformity of application. There is no question but that the tax involved here does meet that requirement. Moreover, it is equally clear that the tax is not apportioned.

Since either approach set out above is logically correct, I have adopted the second simply because, initially at least, it leads onto what seems to be more familiar ground, namely, the nature of "income."

While the majority opinion sets out in full detail the statutory provisions involved, I believe it appropriate to make clear at the outset that the computations under sections 207(a)(1) and 207(a)(2) are not "alternative" taxes as that term ordinarily is understood. The taxpayer has no choice as to the tax it is to pay but must pay whichever is greater in amount. There is actually only one tax lexied, i.e., the tax imposed by the introductory sentence of section 207(a) proper, and subsections (a)(1) and (a)(2) are simply methods of computation of that tax.

The primary contentions of the parties can be stated briefly. The petitioner maintains that the tax in question as applied to it is invalid as an income tax because, in failing to allow a deduction for underwriting losses, it taxes gross receipts and is not limited to either gross income or net income. The respondent contends that the tax is valid as an income tax because it is a tax on gross income, not gross receipts, and that in arriving at taxable income Congress has the power to limit or condition deductions from gross income. (It is perhaps noteworthy that the argument of both parties assumes that the validity of the tax turns upon whether or not it is limited to "income" within the meaning of the 16th amendment.)

In *Eisner* v. *Macomber*, 252 U.S. 189 (1920), the Supreme Court declared that the term "income" as used in the 16th amendment means

the gain derived from capital, from labor, or from both combined, provided it be understood to include profit gained through a sale or conversion of capital assets. In effect, the Court was holding that the 16th amendment used the term in the same sense as it had been construed by the Court in the cases arising under the Corporation Tax Act of 1909. *Stratton's Independence* v. *Howbert*, 231 U.S. 399 (1913); *Doyle* v. *Mitchell Brothers Co.*, 247 U.S. 179 (1918); *Merchants' Loan & Trust Co.* v. *Smietanka*, 255 U.S. 509 (1921). Implicit in this construction is the concept that *gain* is an indispensable ingredient of "income," and it is this concept which provides the standard by which we must determine whether the tax computed under section 207 (a) (2) is a tax on "income" within the meaning of the 16th amendment.

In expressing thus my reliance on the principle announced in *Eisner* v. *Macomber, supra*, I am not unmindful of the cautionary words of the Supreme Court in *Commissioner* v. *Glenshaw Glass Co.*, 348 U.S. 426 (1955), when it declared at page 431:

The distribution, therefore, was held not a taxable event. In that context—distinguishing gain from capital—the definition [in *Eisner* v. *Macomber*] served a useful purpose. But it was not meant to provide a touchstone to all future gross income questions.

However, the Court went on to point out in the latter case that "[h]ere we have instances of undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." (348 U.S. 426, 431.) Conceding, therefore, that there can be many differences of opinion over what constitutes gain in particular circumstances, and recognizing that the decision in *Eisner* v. *Macomber* with respect to whether certain stock dividends represented gain to the taxpayer does not control every other determination of whether a specific item represents gain and, thus, income, I do not conceive that the soundness of the fundamental principle upon which that case was decided can now be questioned, namely, that income within the meaning of the 16th amendment means gain, and, conversely, that where there is no gain there is no income. The dissenting opinion of Mr. Justice Brandeis in *Eisner* v. *Macomber* disputed the Court's opinion only on the question of whether the particular stock dividends in fact represented gain and, thus, income. (252 U.S. 189, 220–238.)

Moreover, the dissenting opinion of Mr. Justice Douglas in *Helvering* v. *Griffiths*, 318 U.S. 371, 404 (1943), while declaring that *Eisner* v. *Macomber* should be expressly overruled, was not based on a conclusion that "income" does not mean "gain." Rather, the dissent directed its disagreement with *Eisner* v. *Macomber* to "[t]he notion that there can be no 'income' to the shareholders in such a case within the meaning of the Sixteenth Amendment unless the gain is 'severed from' capital and made available to the recipient for his 'separate use,

benefit and disposal.'" (318 U.S. 371, 410.) In the case before us, we clearly have no question of whether gain has or has not been severed from capital but simply of whether there is any gain at all.

The rule of *Eisner* v. *Macomber* has been reaffirmed on so many occasions that citation of the cases to this effect would be unnecessarily burdensome. To depart from the rule at this late date would ignore the sound principles upon which that case was decided and would throw into confusion the fundamental income tax structure and law as it has developed in the almost half century which has elapsed since adoption of the 16th amendment. That there cannot be "income" without a "gain" accords with the common understanding of the term, a test of construction which is particularly appropriate in our system of a self-assessed Federal income tax. It is a test which has been applied frequently. For example, in *United States* v. *Kirby Lumber Co.*, 284 U.S. 1 (1931), Mr. Justice Holmes concluded that the taxpayer there involved "has realized within the year an accession to income, if we take words in their plain popular meaning, as they should be taken here." See also *Brown Shoe Co.* v. *Commissioner*, 133 F. 2d 582 (C.A. 8, 1943); *Helvering* v. *Edison Bros. Stores, Inc.*, 133 F. 2d 575 (C.A. 8, 1943). Moreover, that which is not income in fact manifestly cannot be made such by the legislative expedient of calling it income. *Hoeper* v. *Tax Commission of Wisconsin*, 284 U.S. 206 (1931); *Darcy* v. *Commissioner*, 66 F. 2d 581 (C.A. 2, 1933).

The petitioner filed its 1952 return on Treasury Department Form 1120M, entitled "U.S. Mutual Insurance Company Income Tax Return." Its computation of "Gross Amount of Income (under section 207(a) (2))" was as follows:

[ITEM]
19. Total gross income in items 1 to 3, inclusive_____ $16,791.21
20. Net premiums_____ 1,239,884.49

21. Total gross amount of income from interest, dividends, rents,
    and net premiums (item 19 plus item 20)_____ $1,256,675.70
22. LESS: Dividends to policyholders_____ _____
23.     Interest wholly exempt from tax * * *_____ _____
24. Gross amount of income (item 21 minus the sum of items
    22 and 23)_____ $1,256,675.70

The "Total gross income" referred to above in item 19 was made up as follows:

Interest_____ $16,091.21
Dividends_____ 700.00
Rents_____ _____

Total_____ 16,791.21

The tax at 1 per cent of the gross amount of income was computed at $12,566.76, petitioner denying liability for this amount.

Petitioner's 1952 return with respect to the tax computation under section 207(a)(1) listed the following expenses:

| | |
|---|---:|
| Investment expenses | $30.00 |
| Taxes | 22.26 |
| Real estate expenses | 6,053.82 |
| Interest | 655.15 |
| Total expenses | 6,767.23 |

None of these latter amounts is permitted as a deduction in the computation of the gross amount of income under section 207(a)(2) nor does petitioner assert that they should be.

In 1952, the petitioner incurred losses on its policies (sometimes hereafter referred to as underwriting losses), which exceeded its gross amount of income ($1,256,675.70) by $206,198.12. Adding the two amounts together, it can be seen that petitioner incurred underwriting losses in 1952 in the amount of $1,462,873.82. It is in the failure to permit these underwriting losses to be excluded or deducted in computing the tax base under section 207(a)(2) that petitioner asserts Congress has exceeded its constitutional power to tax.

Respondent argues that petitioner's contention is erroneous because deductions are a matter of legislative grace and that Congress may grant them or withhold them as it sees fit in arriving at the net to be taxed. From this principle, he concludes that Congress may validly deny a deduction for underwriting losses even though premium receipts are included in the tax base. The proposition that deductions are a matter of legislative discretion is so well established that it requires no reaffirmation. *Helvering* v. *Independent Life Insurance Co.*, 292 U.S. 371 (1934); *New Colonial Co.* v. *Helvering*, 292 U.S. 435 (1934). Nevertheless, conceding the truth of that proposition, so stated it simply begs the question we must decide.

The income tax is not a tax on gross receipts (*Doyle* v. *Mitchell Brothers Co., supra; Commissioner* v. *Weisman*, 197 F. 2d 221 (C.A. 1, 1952); *Lela Sullenger, supra*), although it is my considered view that the majority opinion implicitly rejects this principle. Thus, amounts which must be subtracted, whether called "exclusions," "deductions," or whatever, in arriving at "income" within the meaning of the 16th amendment have been held not to be matters of legislative grace and to be required by the Constitution. *Davis* v. *United States*, 87 F. 2d 323 (C.A. 2, 1937), certiorari denied 301 U.S. 704, rehearing denied 302 U.S. 773. Therefore, while accepting the principle that deductions are a matter of legislative discretion, the question remains of whether the failure to permit an exclusion for underwriting losses means that petitioner was taxed on something other than "income" in the constitutional sense of the term.

The record before us does not disclose any details of the method of operation of the petitioner. We do not have a copy of its charter, or of its bylaws, or a sample of its policies. Nevertheless, while I recognize that there are a variety of ways in which mutual insurance companies may operate under the laws of the several States, I assume that petitioner possessed the general characteristics common to such companies. "The theory of a mutual insurance company is, that the premiums paid by each member for the insurance of his property constitute a common fund, devoted to the payment of any losses that may occur." *Union Insurance Co.* v. *Hoge*, 21 How. 35, 64 (1858). The members constitute both insurer and insured, contributing by a system of assessments (or premiums) to the creation of a fund from which all losses and liabilities are paid. See 1 Couch, Cyclo. of Ins. Law sec. 250.

Here the net premiums collected in 1952 were insufficient to pay the policy losses incurred in the same year. Those losses were not estimated losses but were actual and realized in the year in question. How the losses were met, the record does not disclose. However, premiums were collected for the purpose of paying losses, and while we may conjecture reasonably that the amount of the premiums was fixed somewhat in excess of the normal loss expectancy in order to meet ordinary expenses and to provide a reserve against extraordinary contingencies, the fundamental nature of the premiums remains, namely, a fund for the payment of losses.

The definition of "net premiums"[1] provided in section 207(b)(2) recognizes that a mutual insurance company may operate by a method of assessment upon its members rather than by levying premiums. Such assessments are treated under the section as the equivalent of premiums. Were a company simply to levy assessments to meet actually incurred losses, I cannot conceive of any concept of "income" which would justify the conclusion that the assessments, to the extent of the losses, represent income to the company. Even in the broadest economic sense, they do not represent gain. I can see no difference here where the fund out of which losses were to be paid was created through the use of premiums.

---

[1] The use of the word "net" is misleading to the extent that it may imply *gain* after the allowance of deductions as in the case of "*net* income." The premiums here are "net" only in the sense that return premiums to policyholders are taken out because they are not part of the actual total premiums finally collected. The following quotation from *Mutual Benefit Life Insurance Co.* v. *Herold*, 198 F. 199, 205 (1912), concerning excess premiums returned to policyholders is relevant although that case involved a mutual level premium life insurance company:

This excess payment represents, not profits or receipts but an overpayment—an overpayment because, being entitled to his insurance at cost and having paid more than it cost, he [the policyholder] is equitably entitled to have such excess applied for his benefit. It makes no difference what this excess is called. * * *

See *Penn Mutual Life Insurance Co.* v. *Lederer*, 252 U.S. 523 (1920).

The record does not disclose what reserves the petitioner possessed but we may infer reasonably that its interest income of $16,091.21 and its dividend income of $700 represented earnings on such a reserve. I also assume that the reserve, whatever its amount may have been, represented the accumulated excess in prior years of petitioner's premium receipts over underwriting losses and after the payment of the expenses of the operation. Since the very purpose of a reserve is to provide a fund out of which liabilities to policyholders can be met, does that fact provide a valid basis for arguing that Congress may tax current premium receipts as "income" without making allowance for current underwriting losses? Stated another way, do the totality of current premium receipts constitute gain, irrespective of current underwriting losses, simply because the taxpayer possesses a reserve built up in prior years out of which those losses, or part of them, may be met? I do not think so. The reserve exists to pay losses which cannot be met by premium receipts. In a very real sense it represents the "capital" of the mutual insurance company, the pooled resources of its members. To use the existence of such a reserve to support the treatment of premium receipts as gains irrespective of underwriting losses would be equivalent to, and just as illogical as, computing the taxable gains of a manufacturer without allowance for losses on the ground that the manufacturer can provide for those losses out of capital. A tax base so constructed becomes a tax on capital, or potentially so, and that I have never understood the income tax to be. In any event, the argument is unconvincing because the section in question makes no provision with respect to reserves and the tax applies irrespective of whether a reserve in fact exists and irrespective of whether underwriting losses exceed the total of premium receipts *and* reserves both.

It might be suggested that losses are properly a charge first against reserves and from that assumption argued that current premium receipts may be taxed in their entirety as "income" without taking those losses into consideration. However, I consider such reasoning to be without merit. If annual additions to the reserve were allowed as a deduction from premium receipts in computing the tax base, I might take a different view. Under that circumstance, it might not be necessary to permit the deduction of *actual* losses in the tax year because properly chargeable to reserves, but such a system presupposes that the taxpayer would be permitted to deduct an annual addition to reserves and that this section does not do. It is true that a taxpayer who employs a bad debt reserve method of accounting must charge actual bad debts in the tax year against that reserve rather than against current receipts, *but* at the same time he is entitled to deduct a reasonable addition to the bad debt reserve. No such allowance is

provided here. On the contrary, the operation of section 207(a)(2) can be compared to requiring a taxpayer to include accounts receivable in taxable income in their entirety while at the same time refusing to permit the same taxpayer to deduct either bad debts as incurred or a reasonable addition to a reserve for bad debts.

What the underwriting experience of this petitioner was in prior years or what its income, if any, was, we do not know, and I do not see that we are concerned with such questions. The income tax is based upon the annual concept of income and, in the complete absence of any expression of contrary congressional intent here, I assume that section 207(a)(2) is intended to conform to that concept. We know the petitioner's receipts in 1952 and we know its underwriting losses incurred in that year. Beyond these facts we need not inquire on the supposititious ground that even though petitioner might have had no taxable income in 1952, the tax computed under section 207(a) (2) may somehow represent a fair measure of tax on income perhaps earned in another year.

It is true that the tax with which we are here concerned is applied at a very low rate, a fact which may furnish a temptation to overlook deficiencies which might otherwise be more serious in their practical effect. However, just as it is not within the judicial province to inquire as to the propriety of a given rate of tax selected by Congress once it is established that the subject of the tax itself is within the taxing power of Congress, so I believe a corollary principle to be that, once it is determined that a given tax is not within the constitutional power of Congress, the rate of tax cannot be considered as affecting its invalidity. A tax which is beyond the power of Congress to levy, is invalid irrespective of the rate at which applied. Likewise, if the tax is within the power of Congress, then Congress may, in its own judgment, select any rate to apply. Any other rule would, in effect, place the courts in the position of deciding at what point a tax rate becomes unreasonable, of substituting their judgment for that of Congress in an area where the elected representatives of the people should have sole responsibility. In any event, a particular tax rate does not in itself necessarily provide a fair measure of the burden of a tax, or the reasonableness of that burden. Here, the 1 per cent tax rate provided by section 207(a)(2) results in a tax computed at $12,566.76. This amount is equivalent to a tax of 75 per cent on the petitioner's gross investment income of $16,791.21, and of more than 100 per cent on the petitioner's "conventional" net income computed under section 207(a)(1).

In support of the view that this tax can be construed as falling only on "income," it might be further argued that section 207(a) provides

a tax on net investment income at the regular corporation income tax rates subject to the proviso that the tax so computed cannot in any event be less than 1 per cent of net premiums plus dividends, rents, and interest. So described, can the tax computed under section 207(a)(2), if not itself a tax on "income," be considered simply a measure of such a tax, a "floor" beneath which the tax on income cannot fall? Assuming for the sake of argument that, once there is determined to be taxable "income," Congress can then select any convenient yardstick by which the actual amount of the tax on that income is to be measured, the proposition still does not aid us here. Section 207(a)(2) is not applicable only if there is income. On the contrary, it applies irrespective of whether there is income. In this connection, a recent writer on the subject of the taxation of casualty insurers has made the following observation: [2]

> Thus the true net income tax has appealing operating advantages. There is no tax payable for years of over-all loss, and there is an automatic offset of any underwriting loss against investment gain in years of over-all profit. The present tax formula for mutuals has neither of these economically sensible attributes. A mutual insurer with an underwriting loss is taxed upon its net investment income even though its underwriting loss exceeds that investment net. Indeed, in a year of heavy losses the dividends to policyholders must commonly be reduced, thus increasing the "net premium" income base for the one per cent gross income tax despite the fact that gross premium writings show no gain. This can result in an economic idiocy, since in a year of over-all loss, the mutual insurer's "income" tax burden will not decline from that borne in a profit year, and it may actually increase both proportionately and absolutely.

The tax computed under section 207(a)(2) clearly is in no way dependent upon whether the taxpayer has income. This being the case, I am unable to accept the proposition that the provision somehow represents a valid measure of a tax on income.

Alternatively, it might be suggested that any going business, including a mutual insurance company, can be presumed to have income and that the computation under section 207(a)(2) simply represents a legislative determination of what constitutes, under certain circumstances, a fair and reasonable amount of tax on that income. The argument is ingenious but hardly persuasive. The imputation of "income" to the mere fact of business existence does not accord with reality, as is perhaps partially evidenced by the fact that the taxpayer here has entered receivership.

The petitioner argues that its losses are akin to the "cost of goods sold" to a manufacturer. The principle is well established, as the respondent agrees, that a manufacturer is entitled to deduct the cost of his materials from gross sales receipts in arriving at gross taxable income. *Doyle* v. *Mitchell Brothers Co.*, *supra; Davis* v. *United*

---

[2] Scott. "Casualty Insurers," 44 Va. L.R. 935, 937, 938 (1958).

*States, supra; Ray Edenfield,* 19 T.C. 13 (1952); *Lela Sullenger, supra.* Nevertheless, the respondent disputes the analogy asserted by petitioner in these words:

A mutual insurance company is not a mercantile business having a cost of goods sold, but is engaged in the business of selling a contract right or promise to perform certain acts upon the happening of a contingency. A mutual insurance company does not have an inventory or stock of goods. In the instant case Penn Mutual, as are all mutuals, consists of a group of persons banding together and pooling contributions to protect members from loss in case certain hazards should beset them. Section 207(a) (2) places a tax on items of gross receipts adjusted for premium returns, etc., which are by definition gross income since a mutual insurance company has no cost of goods sold nor is the tax placed upon capital, borrowings, and the like. All the items enumerated under this section are items specifically includible in gross income, i.e., rents, dividends, interest and net premiums. Petitioner's contentions that gross receipts are being taxed is erroneous.

Obviously, petitioner is not a mercantile business having a cost of goods sold, as such. However, there is nothing in the law which limits deductions from gross receipts to cost of goods sold on the part of a manufacturer. Indeed, the statute itself makes no provision for such a deduction, but rather its allowance arises from the implicit and long-established nature of income itself within the meaning of the 16th amendment. *Davis v. United States, supra.* Therefore, I assume that any other item, whatever label may be attached to it, which is of the same inherent character must also be allowed as a deduction or exclusion in arriving at "income." The same thought is expressed in 1 Mertens, Law of Federal Income Taxation sec. 5.10, as follows:

To say that items of gross income may be taxed is not the same as to say that under all circumstances the courts would countenance a tax on gross receipts. The terms "gross income" and "gross receipts" are not synonymous. "Gross receipts" is a broader term, including within it receipts which may constitute capital as well as income, and, as shown above, returns of capital may not be taxed.

A contract of insurance is an agreement by which one party for a consideration promises to pay money or its equivalent, or to do an act which is valuable to the insured, upon the destruction, loss, or injury of something in which the other party has an interest. Vance, Insurance 83 (3d ed.). While the analogy is certainly not completely apposite, the payment by an insurance company of valid claims under its policies is little different in its practical effect, in my view, from the delivery of goods by a mercantile company. The payment of claims is what the company is selling. It is the very essence of the business in which it is engaged. In the words of the respondent himself, this taxpayer is "engaged in the business of selling a contract right." To argue that it does so at no cost to itself is to ignore reality and to indulge in a form of economic fantasy. Its cost, in the clearest sense, is

represented by the amounts it pays out in satisfaction of claims of policyholders. The fact that here the cost is incurred subsequent to the sale while that of the manufacturer normally is incurred prior to the sale of goods cannot change the fundamental nature of the payment as "cost." Thus, while admittedly we are not dealing here with a mercantile business selling goods, I fail to see any distinction in principle.

If a mutual company operating on a pure system of assessments levied no assessments in a given tax year because its members had incurred no losses in that year, I suppose no one would suggest that it had any "income" within the meaning of the 16th amendment (assuming for the purpose of this hypothesis that it had no investment income). Were the same company to incur losses on policies and levy assessments in an amount exactly needed to meet those losses, I am likewise unable to see how those assessments to the extent of the losses would suddenly constitute "income." The fact that a company operates by means of fixed premiums rather than by assessments cannot alter this conclusion. By mere possession of the premiums or assessments, at least to the extent that they equal its losses, the company has nothing which it can apply to its own benefit or enjoyment.

The respondent also argues, on brief, that by the section in question Congress did not tax underwriting gains and, therefore, "in its sound discretion was certainly entitled to deny a deduction for underwriting losses." Elsewhere in his briefs, respondent asserts, "Since underwriting gains were not taxed, it certainly appears reasonable that underwriting losses were not allowed as deduction." I can only conclude that these statements are based upon a misconception of section 207(a)(2). True, the section does not in terms tax "underwriting gains." Moreover, the report of the Committee on Finance states that the committee was unable to develop what it considered an equitable tax on underwriting income. However, if the taxpayer had underwriting gains (which this petitioner did not), they would presumably have been derived from the very premiums which are included here in its tax base. While section 207(a)(2) concededly does not tax *net* investment income or *net* underwriting income, as such, it taxes the sum total of their ingredients. Since total net premiums are included in the "gross amount of income" subjected to tax, I am unable to accept the respondent's argument that Congress has excluded underwriting gains from the tax base. His argument would seem to suggest that a tax on a manufacturer's total sales receipts would not be a tax on manufacturing gains and, therefore, would not have to permit a deduction for cost of goods sold. The argument does not bear analysis. The mere fact that a tax base

is not *limited* to gains, which is the instant case, hardly leads to the conclusion that gains are not included in the base at all.

The net premiums received by the petitioner do not by themselves constitute gains to it. I conclude, therefore, that section 207(a)(2), to the extent that it includes net premiums in the tax base unreduced by underwriting losses, is not a tax on "income" within the meaning of the 16th amendment. *Eisner* v. *Macomber, supra; Bowers* v. *Kerbaugh-Empire Co.,* 271 U.S. 170 (1926).

In the latter case, involving losses, the Supreme Court had the following to say:

> In determining what constitutes income substance rather than form is to be given controlling weight. *Eisner* v. *Macomber, supra,* 206 (40 S. Ct. 189).
>
> * * * The transaction here in question did not result in gain from capital and labor, or from either of them, or in profit gained through the sale or conversion of capital. The essential facts set forth in the complaint are the loans in 1911, 1912, and 1913, the loss in 1913 to 1918 of the moneys borrowed, the excess of such losses over income by more than the item here in controversy, and payment in the equivalent of marks greatly depreciated in value. The result of the whole transaction was a loss.
>
>     *       *       *       *       *       *       *
>
> The contention that the item in question is cash gain disregards the fact that the borrowed money was lost, and that the excess of such loss over income was more than the amount borrowed. When the loans were made and notes given, the assets and liabilities of defendant in error were increased alike. The loss of the money borrowed wiped out the increase of assets, but the liability remained. The assets were further diminished by payment of the debt. The loss was less than it would have been if marks had not declined in value; but the mere diminution of loss is not gain, profit, or income.

The question still remains of whether section 207(a)(2) is an invalid exercise of the taxing power. As pointed out previously, once it is decided that the subject of a tax is not "income" within the meaning of the 16th amendment, no more has been decided than that the tax is not free from the requirement of apportionment *if it is a direct tax.* Thus, the next and crucial focus of inquiry must be upon whether the tax computed under section 207(a)(2) is a direct tax. Since the tax is unapportioned, a determination that it is a direct tax would require us to decide that it is invalid. "The Amendment allows a tax on 'income' without apportionment, but an unapportioned direct tax on anything that is not income would still, under the rule of the *Pollock* case, be unconstitutional." *Commissioner* v. *Obear-Nester Glass Co.,* 217 F. 2d 56 (1954). So stated, this principle means nothing more than a clear recognition that article I, section 9, clause 4 of the Constitution remains in full force and effect today except to the extent that it is modified by the 16th amendment in the case of taxes on income.

I am not unaware of the fact that distinguished authorities have suggested what may be a contrary view. For example, in his dissent-

ing opinion in *Eisner* v. *Macomber, supra*, Mr. Justice Holmes declared (252 U.S. 189, 220) : "The known purpose of this Amendment was to get rid of nice questions of what might be direct taxes." However, the 16th amendment did not repeal the constitutional requirement as to direct taxes. It could have done so but it did not. The only question it removed for the future was whether a tax on income was a direct tax. *Brushaber* v. *Union Pac. R.R.*, 240 U.S. 1 (1916).

The 16th amendment was the outgrowth of the decision of the Supreme Court in *Pollock* v. *Farmers' Loan & Trust Co.*, 158 U.S. 601 (1895), which had held invalid an earlier effort of Congress to levy an income tax.[3] However, in that decision, the Court did not decide that Congress had no power to levy an income tax under the Constitution. What it did decide was that a tax on incomes of certain types was a direct tax and, thus, invalid in the absence of apportionment. It held that taxes upon rents and profits of real estate and upon returns from investments of personal property were in effect direct taxes upon the property from which such income arose, imposed by reason of ownership; and that Congress could not impose such taxes without apportioning them among the States according to population, as required by article I, section 2, clause 3, and section 9, clause 4 of the original Constitution. *Pollock* v. *Farmers' Loan & Trust Co., supra.*

Thus, the *Pollock* decision did not declare that *any* income tax would be a direct tax but limited its decision on this point to taxes on income from real estate and taxes on income from invested personal property. The Court specifically declared, at page 635 :

We have considered the act only in respect of the tax on income derived from real estate, and from invested personal property, and have not commented on so much of it as bears on gains or profits from business, privileges, or employments, in view of the instances in which taxation on business, privileges, or employments has assumed the guise of an excise tax and been sustained as such.

Nevertheless, despite this limitation upon the scope of the opinion, the Court found that, since so many of the income tax provisions were invalid and since all of the income tax provisions together constituted "one entire scheme of taxation," all of the income tax provisions were void.

The *Pollock* decision itself represented an expansion by the Supreme Court of its earlier decisions as to what constituted a direct tax within the meaning of the Constitution. As early as 1796, the Court had decided in *Hylton* v. *United States*, 3 Dall. 171 (1796), that a direct tax included only capitation taxes and taxes on real estate.

---

[3] Act of Aug. 27, 1894 ; ch. 349, sec. 27, 28 Stat. 509, 553.

To the same effect, see *Pacific Insurance Co.* v. *Soule*, 7 Wall. 433 (1868); *Veazie Bank* v. *Fenno*, 8 Wall. 533 (1869); *Springer* v. *United States*, 102 U.S. 586 (1880). Some hundred years after the *Hylton* decision, the Court concluded that a tax imposed on property or the income therefrom by reason of its ownership is a direct tax. *Pollock* v. *Farmers' Loan & Trust Co., supra.* It would serve no useful purpose to review here the authorities set out in exhaustive detail by the Court in reaching that conclusion. See, in particular, the first *Pollock* opinion. (157 U.S. 429 (1895)).

The majority opinion discusses in some detail Supreme Court decisions involving the validity of various Civil War taxing statutes, particularly *Pacific Insurance Co.* v. *Soule, supra.* In the latter case, involving a tax very similar to that before use here, the Court held the tax valid, rejecting the contention that it was a direct tax, unapportioned. However, the Court based its decision on the narrow ground that direct taxes were only capitation taxes and taxes on real estate, relying on *Hylton* v. *United States, supra.* I think there can be no real question but that the Supreme Court rejected this view of the scope of direct taxes in its *Pollock* decision. This conclusion has been recognized by the Supreme Court itself. In *Eisner* v. *Macomber*, for example, the Court pointed out with respect to one of the Civil War cases, namely, *Collector* v. *Hubbard*, 12 Wall. 1 (1870), that it must be considered to have been overruled by *Pollock*. *Collector* v. *Hubbard* involved the validity of the Act of June 30, 1864, 13 Stat. 281, one of the statutes referred to in the majority opinion as an example of the numerous indirect taxes imposed by Congress. Thus, while *Pacific Insurance Co.* v. *Soule, supra,* and other contemporaneous decisions of that period are of considerable historical interest, I do not believe that the conclusions reached therein can be considered determinative today of the issue before us here.

Among the considerations involved in the determination of the nature of the tax under section 207(a)(2) is whether or not it is an excise tax. In this connection, it has long seemed apparent that the Federal taxing power might in effect reach through excise taxation subjects which it seemingly could not reach through direct taxation. For example, the portion of the *Pollock* decision quoted earlier points out that taxes on the gains and profits of business, privileges, and occupations had been sustained when they assumed the guise of an excise tax. (158 U.S. 601, 635). Subsequently, in *Flint* v. *Stone Tracy Co.*, 220 U.S. 107 (1911), the Supreme Court upheld as an excise tax the Corporation Tax Act of 1909 [4] which imposed a tax

---

[4] Ch. 6, sec. 38, 36 Stat. 112.

on net income. Prior to that time, an 1898 tax on the gross receipts of businesses engaged in sugar refining had been upheld as an excise tax. *Spreckels Sugar Refining Co.* v. *McClain*, 192 U.S. 397 (1904). Prior to the *Pollock* case, the Court had had before it the various Civil War tax acts. As noted previously, among these was a tax on the gross premiums of insurance companies which the Court upheld as an excise tax. *Pacific Insurance Co.* v. *Soule, supra.* Moreover, the Court has upheld as excise taxes, as against the contention that they were direct taxes, the Federal estate tax in *Knowlton* v. *Moore*, 178 U.S. 41 (1900), and the Federal gift tax in *Bromley* v. *McCaughn*, 280 U.S. 124 (1929).

It seems to me that the question of whether or not a particular tax is an excise is basically the same question as whether it is direct or indirect. If found not to be direct, it can make no difference whether it is an excise or something else. I certainly subscribe to the statement in the majority opinion that the "validity of an exercise of congressional power cannot depend upon the verbal tag attached to it." It would be preposterous to have the Federal taxing power circumscribed by the artificialities of mere form. Nevertheless, I believe that the intent of Congress as evidenced by the statute itself and its legislative history is of significance in determining the nature of the tax imposed.

In *Spreckels Sugar Refining Co.* v. *McClain, supra*, the Court accorded great weight to the intent of Congress as evidenced by the exact words of the particular statute. The section of the statute involved [5] provided in part:

That every person, firm, corporation, or company carrying on or doing the business of refining petroleum, or refining sugar, or owning or controlling any pipe line for transporting oil or other products, whose gross annual receipts exceed two hundred and fifty thousand dollars, shall be subject to pay annually a special excise tax equivalent to one quarter of one per centum on the gross amount of all receipts of such persons, firms, corporations, and companies in their respective business in excess of said sum of two hundred and fifty thousand dollars. * * *

Rejecting the argument that the tax so imposed was a direct tax, the Court interpreted the quoted provision in these words (192 U.S. 397, 411):

Clearly the tax is not imposed upon gross annual receipts as property, but only in respect of the carrying on or doing the business of refining sugar. It cannot be otherwise regarded because of the fact that the amount of the tax is measured by the amount of the gross annual receipts. The tax is defined in the act as "a special excise tax," and, therefore, it must be assumed, for what it is worth, that Congress had no purpose to exceed its power under the Constitution, but only to exercise the authority granted to it of laying and collecting excises.

---

[5] Act of June 13, 1898, ch. 448, sec. 27, 30 Stat. 448, 464.

The tax imposed on corporation incomes by the Act of 1909 and upheld by the Supreme Court in *Flint* v. *Stone Tracy Co., supra*, was denominated in the statute itself as a "special excise tax with respect to the carrying on or doing business" as a corporation. Referring to this evidence of the nature of the tax, the Court declared (p. 145):

While the mere declaration contained in a statute that it shall be regarded as a tax of a particular character does not make it such if it is apparent that it cannot be so designated consistently with the meaning and effect of the act, nevertheless the declaration of the lawmaking power is entitled to much weight, and in this statute the intention is expressly declared to impose a special excise tax with respect to the carrying on or doing business by such corporation, joint stock company or association, or company. * * *

Can the tax computed under section 207(a)(2) be considered as an excise tax on the carrying on of business as a mutual insurance company (other than life or marine)? I think not. The only possible evidence in the statute itself in support of such a proposition is the fact that the tax is limited to corporations of a certain type. Indeed, it is even more limited in scope because section 207(a), in the first instance, only applies to those mutual insurance companies (other than life or marine) which are not totally exempt under section 101(11) because of their small size. Further, even though not exempt under section 101(11), a company is only subject to the tax computed under section 207(a)(2) if the tax under (a)(1)—a net income tax—is smaller. To conclude from the very limitations on the scope of the tax that the tax must therefore be construed as having been imposed as an excise with respect to carrying on the particular type of activity which finds itself subject to the tax, would seem to require that any tax is an excise so long as the taxpayer class is sufficiently narrow. The illogic of such a conclusion is fatal to the proposition.

Alternatively, can the tax be considered as an excise tax on the receipt of premiums? Recognizing that such a tax is commonly imposed by the States, which have no constitutional limitations in terms of direct taxes, I fail to see how section 207(a)(2) can be so construed in view of the fact that the gross amount of income taxed under the section includes dividends, rents, and interest. Certainly, there is a complete absence of any language evidencing an intent to impose such a tax.

I am unable to find any persuasive evidence here that the tax in question is an excise tax. Indeed, all of the evidence is to the contrary. Section 207(a)(2) is part of chapter 1 of the Internal Revenue Code of 1939 entitled "Income Tax." That its administration by the Treasury Department has recognized this classification is indicated by the return form entitled "U.S. Mutual Insurance Company Income Tax Return For Mutual Insurance Companies Other than Life or

Marine Insurance Companies or Fire Insurance Companies Issuing Perpetual Policies." Section 207(a) specifically imposes a tax upon "income" as such, the tax being computed under (a)(1) or (2) whichever produces the greater amount. As I have already pointed out, companies are subject to section 207(a) and its various parts only if not exempt from tax under section 101(11). Section 101 has always been conceived of as an income tax exemption section only. Certainly, organizations exempt from tax under section 101 have never been exempt, for that reason, from liability for any of the Federal excise taxes. Section 207(a)(2) excludes tax-exempt interest from the base of the tax and yet the Supreme Court had made it clear in *Flint* v. *Stone Tracy Co.*, *supra*, that such an exclusion was not necessary to the validity of an excise tax. The whole framework of this tax evidences an intent to levy an income tax, a conclusion borne out by the debates in the Senate on the Revenue Act of 1942. In explaining these provisions of the bill, Senator George, who was chairman of the Committee on Finance where section 207(a)(2) had originated, declared:

The tax does not apply to corporations if the gross amount received during the taxable year from interest, dividends, rents, and premiums, including deposits and assessments, does not exceed $75,000. Therefore practically all the farmers' and other small and local mutual companies will not be required to file *income-tax* returns or pay *income taxes*. It is estimated that over 80 percent of all mutual companies will be exempt from filing returns under this provision. [Emphasis supplied.][6]

Similarly, Chairman Doughton of the Committee on Ways and Means, in explaining the conference report to the House described section 207(a)(2) as a tax on "gross income."[7]

In determining whether section 207(a)(2) is an excise tax, consideration must be given to *Stanton* v. *Baltic Mining Co.*, 240 U.S. 103 (1916), referred to in the majority opinion and accorded considerable weight therein. In that case, arising under the 1913 income tax act, it was argued by the taxpayer that a failure to provide an adequate allowance for depletion of a mineral property resulted in the tax being a direct tax on property which must be apportioned. With reference to this argument, the Supreme Court stated:

It moreover rests upon the wholly fallacious assumption that looked at from the point of view of substance a tax on the product of a mine is necessarily in its essence and nature in every case a direct tax on property because of its ownership unless adequate allowance be made for the exhaustion of the ore body to result from working the mine. We say wholly fallacious assumption because independently of the effect of the operation of the Sixteenth Amendment it was settled in *Stratton's Independence* v. *Howbert*, 231 U.S. 399, [58 L. Ed. 285, 34 Sup. Ct. Rep.

---

[6] 88 Cong. Rec., 77th Cong., 2d Sess., p. 7795.
[7] 88 Cong. Rec., 77th Cong., 2d Sess., p. 8456.

136] that such a tax is not a tax upon property as such because of its ownership, but a true excise levied on the results of the business of carrying on mining operations * * *

The apparent meaning of the quoted language would seem to be that any tax on a mining corporation, and presumably on any other business entity, is per se an excise tax, sustainable as such without regard to the limitations normally demanded of an income tax. Yet *Stratton's Independence* v. *Howbert, supra,* cited in support of the statement, provides no authority for such a rule. *Stratton's Independence* v. *Howbert* involved the Corporation Tax Act of 1909, which, as pointed out above, had been upheld in *Flint* v. *Stone Tracy Co., supra,* specifically on the basis that it was intended to be and was enacted as an excise tax. The decision in the latter case, upon which *Stratton's Independence* v. *Howbert* was, in large part based, very carefully pointed out that its specific nature as an excise was the material and significant distinction between the 1909 tax and the 1894 income tax held invalid in *Pollock.* To interpret *Stanton* v. *Baltic Mining Co., supra,* as standing for the proposition that this is merely a distinction without a difference seems to me to be contrary to the reasoning of both *Pollock* and *Flint* v. *Stone Tracy Co.,* and, perhaps more significant, completely contrary to subsequent Supreme Court decisions, notably *Doyle* v. *Mitchell Brothers Co., supra,* and *Eisner* v. *Macomber, supra.*

Since, in my opinion, the tax here involved is nothing more or less than a tax on gross receipts, to hold it to be an excise tax in the complete absence of any real indicia of such a tax could only be grounded on the premise that a tax on the gross receipts of a business is per se an excise tax and sustainable as such. Certainly, to seize upon the phrase "special tax" employed in one instance in the lengthy Senate Finance Committee report[8] on section 207(a) as somehow being sufficient to impart to the tax the magical quality of being an excise is hardly convincing, especially in view of the bulk of the legislative history which demonstrates overwhelmingly that the tax was conceived and designed as an income tax. "Special" the tax may well be but "special" only in the sense of being unusual, different, a departure from the normal. Since the essential question here is whether the tax is direct or indirect, I cannot believe that, by mere reference to a tax as "special," Congress can thus make it "indirect." To hold otherwise, would be to elevate form over substance with a vengeance. The use of the descriptive word "special" obviously can have no relevancy whatsoever to a determination of what it is that is being taxed or how

---

[8] Report of the Committee on Finance, U.S. Senate, to accompany H.R. 7378, S. Rept. No. 1631, 77th Cong., 2d Sess., pp. 150–154.

it is being taxed. This being the case, I consider the use of the word "special" equally irrelevant to a determintion of whether the tax is direct or indirect.

Indeed, even though the tax were specifically denominated an "excise" in the statute, that fact alone, while entitled to great weight in determining the intent of Congress, could not preclude a holding that it is direct and thus must be apportioned. As declared by the Supreme Court in *Brushaber* v. *Union Pac. R. R.*, *supra* at 16:

Moreover, in addition, the conclusion reached in the *Pollock Case* did not in any degree involve holding that income taxes generically and necessarily came within the class of direct taxes on property, but, on the contrary, recognized the fact that taxation on income was in its nature an excise entitled to be enforced as such *unless and until it was concluded that to enforce it would amount to accomplishing the result which the requirement as to apportionment of direct taxation was adopted to prevent, in which case the duty would arise to disregard form and consider substance alone, and hence subject the tax to the regulation as to apportionment which otherwise as an excise would not apply to it.* * * * [Emphasis supplied.]

Thus, whether called an excise or not, a direct tax is still subject to the constitutional requirement of apportionment.

It is true, as pointed out earlier in this opinion, that the Supreme Court in the *Pollock* case limited its opinion to a decision that taxes on the income from real estate and on the income from invested personal property were direct taxes. It refused to decide whether taxes on the "*gains or profits* from businesses, privileges, or employments" (emphasis supplied) were equally direct taxes. In fact, the Court's opinion leaves the distinct impression that it might not have considered them as such had it been confronted squarely by the issue but would have sustained them as excises. Since the petitioner here is certainly a "business," must we conclude in conformity with the above-quoted dictum that the tax computed under section 207 (a) (2) is sustainable as an excise? I am satisfied that such a result is not required because the subject of the tax with which we are here concerned is not "gains or profits" but gross receipts. A direct tax is defined as a tax on property because of ownership. *Pollock* v. *Farmers' Loan & Trust Co.*, *supra.* Gross receipts in the hands of an insurance company are property under any conceivable definition of the term. Here we do not have, as did the Supreme Court in *Pollock*, nice questions concerning the source of the receipts. Because *Pollock* involved a tax on net income, the Court felt impelled to consider the sources of the income in question in order to determine whether or not those sources fell within the category of "property." Admittedly, the *Pollock* decision has not been entirely free from criticism over the years. More than one authority has questioned its basic premise, namely, that a

tax on net income is per se a tax on the property from which the income is derived, and it can be argued with some force that a tax on the income from property is not a burden on the property itself because being limited to "income" (whether called gross or net) it cannot diminish the underlying property. But, in my view, no such argument can be made reasonably with respect to a tax on gross receipts. In the simplest, most understandable sense, they are themselves property. Therefore, the tax here on petitioner's gross receipts, to the extent they are not reduced by losses and thus not limited to "income," is a tax on property because of ownership. This being the case, it is a direct tax, and being unapportioned, it is invalid.

Is this view contrary to *Pacific Insurance Co.* v. *Soule; Spreckels Sugar Refining Co.* v. *McClain; Stanton* v. *Baltic Mining Co.*, all *supra?*

I have indicated earlier the view that, since *Pacific Insurance Co.* v. *Soule, supra,* rested on the premise that direct taxes were only capitation taxes and taxes on real estate, the reasoning of the Court in that case must be considered to have been rejected, at least by implication, in the *Pollock* decision. The fact remains, however, that subsequent to *Pollock* the Supreme Court placed primary reliance upon the *Pacific Insurance Co.* case in its *Spreckels Sugar Refining Co.* decision which upheld a gross receipts tax on sugar refiners. In the latter case, following the statement previously quoted in this opinion, the Court went on to say:

This general question has been considered in so many cases heretofore decided that we do not deem it necessary to consider it anew upon principle. It was held in *Pacific Ins. Co.* v. *Soule,* 7 Wall. 433, 19 L. ed. 95, that the income tax imposed by the internal revenue act of June 30th, 1864, amended July 13th, 1866 (13 Stat. at L. 276, chap. 173, 14 Stat. at L. 98, chap. 184), on the amounts insured, renewed, and continued by insurance companies, on the gross amount of premiums received, on dividends, undistributed sums and income, was not a direct tax, but an excise duty or tax within the meaning of the Constitution; * * *

Are we to understand that these two cases, taken together, stand for the principle that a tax on the gross receipts of a business is inherently an indirect tax? If so, then candor requires me to admit that my own conclusions in the instant case are plainly inconsistent therewith. On the other hand, does the fact that in its *Spreckels* decision the Supreme Court attached great weight to the announced intention of Congress to levy an excise together with the fact that it there interpreted its earlier decision in *Pacific Insurance Co.* v. *Soule* as being based upon a similar consideration, permit the conclusion that the statutes there involved are distinguishable from that with which we are here concerned? This question forces us to return to the troublesome inquiry of whether the form of the tax carries with it real constitu-

tional significance. Certainly, the decided cases suggest that it does and yet this is a rationale which I find difficult to accept. I would suppose that constitutional limitations upon the Federal taxing power might be designed to accomplish any number of purposes, such as insulating certain subjects from the exercise of that power or reserving the taxation of those subjects to the States, but whatever their purpose, I think we must assume that the limitations were intended to be real and not directed to form alone. If, for example, the purpose of a given limitation is to reserve the exercise of a particular power to tax to the States, what possible difference does it make, in terms of whether the prerogative of the States is being invaded thereby, if the tax in question is levied as an excise tax, income tax, or just as a plain tax? So long as the base and the rate are identical, the substantive effect and the real nature of the tax must remain the same, no matter what it is called.

Inability to accept the result in the *Pacific Insurance Co.* and *Spreckels* cases as having been based upon form alone might seem to lead inevitably to the principle stated above that a tax on gross receipts is inherently an indirect tax and, thus, valid in the absence of apportionment and irrespective of whether there is "income" or not. Yet, adoption of this alternative would seem to be directly contrary to the rationale implicit in *Southern Pacific Co.* v. *Lowe*, 247 U.S. 330 (1918), *Eisner* v. *Macomber, supra,* and *Bowers* v. *Kerbaugh-Empire Co., supra,* among others, as well as such lower court decisions as *Davis* v. *United States, supra,* and *Commissioner* v. *Weisman, supra.* Moreover, it would be contrary to what I conceive to be the commonly held view.

*Stanton* v. *Baltic Mining Co., supra,* is sometimes considered to stand for the principle that Congress may levy an income tax on receipts without allowance for recovery of capital because in that case the Supreme Court rejected the taxpayer's contention that the statute failed to permit him an adjustment for true depletion. If that is the proper interpretation of the decision, it would certainly seem to have been rejected in *Doyle* v. *Mitchell Brothers Co., supra,* and the other cases to which reference has just been made. However, I am satisfied that such an interpretation is not required. In the first instance, the value of a mineral deposit is often so conjectural as to make a computation of "true" depletion difficult if not impossible. Second, the statute involved did in fact provide for a deduction of a reasonable allowance for depletion, subject merely to an overall limitation. Thus, the Court was not presented with the question of whether Congress could have validly denied the taxpayer *any* allowance for depletion. This being the case, I see no reason to impute to that decision a principle plainly at variance with subsequent declarations of the Court.

The majority opinion upholds the validity of section 207(a)(2) on the basis that it is an indirect tax. Having done so, it does not concern itself with whether something other than "income" under the 16th amendment is being taxed. It does not inquire as to the nature of the tax base, other than to set forth the statutory provisions involved. With respect to the contentions of the petitioner concerning its underwriting losses, the opinion states simply:

It is familiar doctrine that deductions are a matter of legislative grace * * *, and it seems unlikely that there is a *constitutional* requirement based upon the 16th amendment calling for the deduction which petitioner insists is indispensable to the validity of the unapportioned tax. However, that is an issue that we need not reach.

As I stated previously, under the majority's approach, the question of whether the tax is limited to "income" is constitutionally irrelevant once it is determined that it is not direct.

Moreover, aside from the passing reference to it as a "special tax," which I have indicated can hardly be considered to carry with it real constitutional significance, the majority decision that this is an indirect tax clearly does not seem to turn upon a determination that it is an excise. True, the opinion cites *Stanton* v. *Baltic Mining Co.*, *supra*, as authority for the assertion that the tax here involved is "sustainable as an excise on carrying on an insurance business." However, since the opinion does not inquire as to whether any of the usual indicia of an excise tax are present, I can only assume that this result is based upon the conclusion that *any* tax upon the receipts of a business is inherently an excise and inherently indirect. I say "*any* tax" advisedly because the majority opinion apparently considers any question of what elements go to make up the tax base under section 207(a)(2) to be immaterial, and it does not discuss them. This conclusion does seem to accord with the apparent holding in *Stanton* that the 1913 income tax is an excise tax, at least insofar as the particular taxpayer is engaged in business. The principle likewise accords with the statement by the Supreme Court in *Spreckels Sugar Refining Co.* v. *McClain*, *supra*, that the 1864 income tax on insurance companies had been sustained as an excise in *Pacific Insurance Co.* v. *Soule*, *supra*.

If it is true that a tax on the receipts of a business is per se indirect, irrespective of whether imposed in terms as an income tax or as an excise tax or otherwise, then it is certainly true that there is no constitutional bar with respect to the taxation of business receipts without any allowance for cost of goods sold, without any allowance for losses incurred, and without allowance for recovery of capital. Certainly, the statute involved in *Spreckels* permitted no adjustment for such items. However, if one believes, as I do, that these items and others

of a similar nature are constitutionally protected, then I think it necessary to take issue with the concept of "indirect" taxation embraced by the majority here. I have already agreed that it is incorrect to conceive of the 16th amendment as barring the taxation of such items because of their not being "income" within the meaning of the amendment. Thus, the only conceivable remaining constitutional barrier to such taxation would have to be based upon the conclusion that it is unapportioned direct taxation. This being the case, one's understanding of the scope of the term "direct tax" becomes of critical importance in determining the scope of the Federal taxing power.

I cannot accept a conclusion that the receipts of a business taxpayer are entitled to a different constitutional protection than are the receipts of a nonbusiness taxpayer. Such a distinction would be untenable in principle as well as impractical of application in many instances. We are all too familiar with the difficulties inherent in the determination of whether an individual is engaging in business or not. Nowhere in the Constitution do I find any warrant for such a distinction. Moreover, since recovery of capital is most frequently involved in what are business or business-type transactions, the drawing of such a distinction would simply make any constitutional restriction with regard to such an item quite meaningless.

Certainly, the *Pollock* decision required no such distinction. While the opinion indicated that a tax on the gains and profits of businesses, privileges, and employments would be an indirect tax, there is no suggestion in the opinion that a tax on property in the hands of those so engaged would not be a direct tax invalid in the absence of apportionment to the same extent as if held by persons not so engaged. Indeed, the particular taxpayer as against which the validity of the tax was tested was a bank. That it was the type of property rather than who owned it which was the test applied by the Court was indicated by Mr. Justice Harlan in his dissent at 158 U.S. 601, 673:

And it is now the law, as this day declared, that under the Constitution, however urgent may be the needs of the Government, however sorely the administration in power may be pressed to meet the moneyed obligations of the nation, Congress cannot tax the personal property of the country, nor the income arising either from real estate or from invested personal property, except by a tax apportioned among the States, on the basis of their population, while it *may* compel the merchant, the artisan, the workman, the artist, the author, the lawyer, the physician, even the minister of the Gospel, *no one of whom happens to own real estate, invested personal property, stocks or bonds*, to contribute directly from their respective earnings, gains, and profits, and under the rule of uniformity or equality, for the support of the government. [Second emphasis supplied.]

The severest contemporaneous criticisms of the *Pollock* decision were directed to the fact that it resulted in different kinds of income being

accorded different constitutional protections, in income from real estate, stocks, and bonds being elevated to a preferred position.[9] It was to remove this very distinction that the 16th amendment was framed and adopted so that incomes *regardless of source* could be treated and taxed alike. To read now into the Constitution a new distinction based, not upon source, but upon the status of the recipient would simply be to develop new disparities and new inequities of the very sort which the 16th amendment was adopted to proscribe. Such distinctions may be proper as a matter of legislative discretion but should not be established as constitutionally required.

While the majority opinion makes no attempt to define a "direct" tax, it gives considerable weight to the suggestion that to require apportionment of the tax here involved would have "bizarre and inequitable consequences." While one can hardly take exception to such a characterization, I do not consider that it furnishes a very significant criterion of the nature of the tax. It is not a logical argument to say that a particular tax cannot be construed to be direct simply because it may be impractical to impose it by apportionment. The Supreme Court specifically rejected the same argument in the *Pollock* case. To levy a Federal tax on real estate by apportionment among the States according to population would certainly lead to disparate results as between different taxpayers, but it has always been accepted that such a tax would be direct and would have to be apportioned.

There is no suggestion in the majority opinion that it rejects any of the traditionally accepted views as to the meaning of "direct" taxes. Thus, while the opinion does not offer any definition of the term, I would suppose that it would adhere to the principles laid down in *Pollock* and elsewhere that capitation taxes, taxes on real estate, taxes on personal property, and taxes on the receipts from real estate and personalty are direct taxes which must be apportioned save to the extent the particular tax is limited to income and, thus, freed of apportionment by the 16th amendment. For example, I assume that a taxpayer's receipts from real estate are taxable, without apportionment, only to the extent that the receipts constitute income within the meaning of the 16th amendment. Thus, I conceive of a reasonable allowance for depreciation in such a case as being constitutionally required. In *Helvering* v. *Independent Life Insurance Co.*, 292 U.S. 371 (1934), the Supreme Court clearly stated, in the case of an insurance company taxpayer, that the mere rental value of a building used by the owner does not constitute income within the meaning of the 16th amendment, citing *Eisner* v. *Macomber, supra,*

---

[9] For a discussion of this background, see S. Rept. No. 2140, Part 2, 76th Cong., 3d Sess., p. 33 *et seq.*

and that a tax on such value as income would be a direct tax requiring apportionment, citing *Pollock* and a number of subsequent decisions. Yet, if one accepts the premise implicit in the majority opinion, based upon *Stanton* v. *Baltic Mining Co.*, *supra*, that an income tax on an insurance company is sustainable in all events as an excise, then the principle stated by the Supreme Court in *Helvering* v. *Independent Life Insurance Co.*, *supra*, must have been in error because excise taxation has never been considered as limited constitutionally to "income." Certainly, I find no suggestion in the latter case, consistent with the rationale of the majority opinion here, that the income tax there involved was simply an indirect tax on carrying on an insurance business so that no question of income under the 16th amendment was material to its decision. On the contrary, the entire opinion is reasoned within the framework of established concepts of "income."

I assume that the cases do not require the elevation of real estate, or the receipts therefrom, to a preferred position under the Constitution. *Pollock* made it clear that personal property was entitled to at least equivalent treatment, and in *Willcutts* v. *Bunn*, 282 U.S. 216 (1931), the Supreme Court pointed out that a tax on the interest from bonds would be a tax on the owner "by virtue of the mere fact of ownership." Basically, it seems to me that an attempt to draw a distinction between different types of property is unwarranted in determining constitutional protection, and, as previously suggested, would be the very type of distinction which the 16th amendment was adopted to prevent. Property is property, whether it is real or personal, tangible or intangible, and a tax on gross receipts because of ownership, whether derived from real estate, invested personalty, or indeed from a valuable contractual right, is a direct tax on property requiring apportionment to the extent not limited to "income." Any other rule would lead to such disparate treatment of different types of property as to be foreign to established concepts of uniform treatment.

In any event, as I have stated previously, we need not concern ourselves here with the source of the receipts involved in the instant case because they are themselves property. If the tax computed under section 207(a)(2) is valid at 1 per cent, I assume it would be equally valid at 10 per cent, 50 per cent, or at any other rate. Levied annually, such a tax is an exaction, not out of income, but out of the underlying assets of the taxpayer and could result in their progressive liquidation. It is a clear example, in my mind, of direct taxation of property.

To decide that gross receipts are property is not to signal a new point of departure in delineating the scope of the Federal taxing power but simply establishes a logical basis for the often-announced doctrine that an income tax on gross receipts, to the extent that it

falls on that which is not "income," is invalid. Indeed, no other conclusion is possible if one is convinced that such receipts in excess of "income" are not within the Federal taxing power except by apportionment. Nor would the principles suggested by myself disturb the basic scheme of Federal income taxation as embodied in the Internal Revenue Code. Section 207(a)(2) is the only provision of the entire income tax law, insofar as I have been able to determine, that seeks to tax gross receipts in excess of income. Elsewhere, the statute, the regulations issued thereunder, and the decisions of the courts have sought to exclude from the tax base those elements of gross receipts, such as return of capital, cost of goods sold, and losses, which do not constitute income. Moreover, my analysis does not contravene the fact that, in many and perhaps most instances, gross receipts are identical to gross income and, thus, taxable in their entirety absent statutory deductions.

I realize that in the recent case of *Commissioner* v. *Sullivan*, 356 U.S. 27 (1958), the Supreme Court appeared to give some support to the view that Congress could tax gross receipts when it stated at page 29:

If we enforce as federal policy the rule espoused by the Commissioner in this case. we would come close to making this type of business taxable on the basis of its gross receipts, while all other business would be taxable on the basis of net income. If that choice is to be made, Congress should do it. * * *

The Court had before it the question of whether amounts paid by professional bookmakers as wages and rent were deductible from gross income as ordinary and necessary business expenses. In their tax computation, the taxpayers presumably had already applied section 23(h) of the 1939 Code which permitted the deduction of gambling losses to the extent of the gambling gains. Thus, there was no question involved in the *Sullivan* case of a tax on gross receipts but simply of deductions from gross income.

I certainly agree with the majority that there is a strong presumption in favor of the validity of a taxing statute and that doubts must be resolved in favor of its validity, and I cannot dispute the fact that some decisions of the Supreme Court appear to support the majority view. However, I am satisfied that the great weight of authority is contrary to that view and is largely embodied in decisions of the Supreme Court handed down subsequent to those relied upon by the majority. One fact is abundantly clear and that is that the scope of the Federal taxing power does not lend itself to dogmatism or categorical opinion. The concept of taxable income is at best "elusive and restless." *United States* v. *Wyss*, 239 F. 2d 658 (C.A. 7, 1957). Recognizing that judicial doctrine in the area necessarily has been developed on a case-by-case basis, it is perhaps inevitable that some lack of harmony may have arisen. In view of this

fact, I do not conceive of the presumption of validity as necessarily requiring adoption in all events of those cases which extend the Federal taxing power especially when there are contrary cases of later date. Such a course inevitably would subject the constitutional limitations and qualifications on the exercise of that power to a process of judicial erosion.

On the question of jurisdiction, I agree thoroughly with the concurring opinion of Judge Murdock.

FORRESTER, *J.*, agrees with this dissent.